1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

3

4  UNITED STATES OF AMERICA,       )  No. 18 CR 696
                             )
5           vs.                 )
                             )
6  ASHRAF AL SAFOO, also known as Abu  )
    Al-Abbas Al-Iraqi, also known as     )
7  Abu Shanab, also known as Abbusi,   )  Chicago, Illinois
                             )  October 31, 2018
8           Defendant.    )  1:34 p.m.

9

                TRANSCRIPT OF PROCEEDINGS
10   BEFORE THE HON. M. DAVID WEISMAN, MAGISTRATE JUDGE

11

   APPEARANCES:
12

13  For the Government:    MR. VIKAS K. DIDWANIA
                        MS. MELODY WELLS
14                   MR. PETER S. SALIB
                        United States Attorney's Office,
                        219 South Dearborn Street, Room 500,
15                 Chicago, Illinois  60604

16  For the Defendant:     MR. GEOFFREY M. MEYER
                        MS. MARIA TERESA GONZALEZ
17                   Federal Defender Program,
                        55 East Monroe Street, Suite 2800,
18                 Chicago Illinois  60603

19

20

21

22

23                PATRICK J. MULLEN
                Official Court Reporter
24           United States District Court
       219 South Dearborn Street, Room 1412
25          Chicago, Illinois  60604
                (312) 435-5565

1          THE CLERK:  18 CR 696-1, U.S.A. versus Ashraf Al

2    Safoo.

3          MR. DIDWANIA:  Good afternoon, Your Honor.  Vikas

4    Didwania and Melody Wells and Pete Salib on behalf of the

5    United States.

6          MS. WELLS:  Good afternoon, Your Honor.

7          THE COURT:  Good afternoon.

8          MR. MEYER:  Good afternoon, Judge.  Geoffrey Meyer and

9    Maria Teresa Gonzalez from the Federal Defender Program on

10    behalf of Mr. Al Safoo.

11          THE COURT:  Good afternoon.

12          Good afternoon, Mr. Al Safoo.

13          THE DEFENDANT:  Good afternoon.

14          MS. NEELIN:  Good afternoon, Your Honor.  Laura Neelin

15    on behalf of pretrial services.

16          THE COURT:  Good afternoon.  Thank you for being here.

17          All right.  We're here for a continued detention

18    hearing.  Where does the Government stand on the issue?

19          MR. DIDWANIA:  The Government is ready to proceed with

20    the hearing, Your Honor, and we continue to believe that

21    alongside pretrial's recommendation detention is appropriate in

22    this case.

23          THE COURT:  All right.  Where is the defendant on the

24    issue?

25          MR. MEYER:  Judge, we are asking to proceed with the

1 detention hearing today. We believe there are conditions that

2 can be put in place.

3 THE COURT: All right. Let's start with the

4 Government's basis for detention. Risk of flight and danger to

5 the community were the two articulated bases at the last

6 hearing. I identified some case law that I asked both sides to

7 look at. Does the Government believe that danger to the

8 community remains a valid basis?

9 MR. DIDWANIA: Yes, we do, Your Honor. I'd like to

10 start with 18 U.S.C. 3142 and specifically subsection (f)

11 governing detention hearings. Under subsection (f), the Court

12 is allowed to consider both risk of non-appearance and danger

13 to the community under subsection (1) upon a motion of the

14 attorney for the Government in a case that involves, among

15 others, an offense listed in section 2332(b)(g)(5)(b). If we

16 look to that section, 2332(b)(g)(5)(b), one of the offenses

17 listed is 2339(b), which is material support to a designated

18 foreign terrorist organization, which is the charge in this

19 case.

20 THE COURT: All right. Do you agree, Mr. Meyer?

21 MR. MEYER: We do, Judge.

22 THE COURT: All right.

23 MR. DIDWANIA: Furthermore, just to finish that point,

24 Judge, there is a rebuttable presumption in this case under

25 subsection (e)(3). If we look at (e)(3), Judge, subject to

1    rebuttal by the person, it again lists --

2              THE COURT:  Let's see.  Do you agree?

3              MR. MEYER:  We do, Judge.

4              THE COURT:  All right.  Let's start with rebutting the

5    presumption.  How would you rebut the presumption?

6              MR. MEYER:  So, Judge, we do recognize under (e)(3)

7    that there is a rebuttable presumption in this case.  That

8    presumption represents a congressional determination that in

9    general there are categories of defendants charged with

10   categories of crime where Congress has determined that they are

11   more likely to continue to commit criminal acts while out on

12   bond than other offenders.

13             But that presumption is rebuttable and not mandatory

14   because Congress also recognized the fact that what is true in

15   the general is not always true in the specific, and it gives

16   the defendant the opportunity to show that his specific

17   circumstances show that he will not continue to commit or

18   engage in crime while out on bond.

19             It's important to remember that to rebut the

20   presumption the defendant need not necessarily show that they

21   are not guilty of the crimes as charged in the complaint, and

22   it is also important to remember that the defendant only has

23   the burden of production here, and that even with this burden,

24   the burden of persuasion that there are no conditions that can

25   be put in place remains squarely with the Government.

1          THE COURT:  I agree with all that.  So what's your

2      production?

3          MR. MEYER:  So here's our production, Judge, and we're

4      working off of the two pretrial services reports that the Court

5      has received.  The Court is allowed to consider any of the

6      types of evidence that it would normally consider at a hearing

7      under section 3142(g), and here all of that evidence shows that

8      the presumption shouldn't apply.

9          Mr. Al Safoo has strong family ties to the area.  His

10     wife and his three young children live in Chicago as do his

11     father and two of his siblings.  His mother along with other

12     siblings lives close by in the Midwest up in Michigan.  Because

13     of this location close in proximity to his family members, he

14     also has strong family support.  I think that came through

15     particularly in the supplemental report where pretrial services

16     discussed Mr. Al Safoo's situation with this father and Mr. Al

17     Safoo's father was able to verify all the information in the

18     report and let the pretrial services office know that they

19     speak daily.  In addition to that, his family has been present

20     both at the last scheduled detention hearing and this detention

21     hearing.

22         Mr. Al Safoo is also an educated individual, and at

23     the time of his arrest he was gainfully employed.  He has been

24     gainfully employed since coming to the United States ten years

25     ago as a refugee from Iraq.  He's lived in the United States

1  for those last ten years, and five years ago he undertook the

2  arduous process of naturalizing to become a United States

3  citizen and completed that and was naturalized five years ago.

4        He has no criminal history and has had no contact with

5  law enforcement of any kind while he's been in the United

6  States, and he has no history of drug or alcohol abuse or any

7  sort of mental disorder.

8        The Seventh Circuit told us in United States versus

9  Dominguez, which is 783 F. 2d 702, that the burden of

10  production is not a heavy one to meet.  The defendant just has

11  to put forth some evidence, and we have in this case,

12  particularly if you compare this case to the Dominguez case.

13        In that case, the defendants there met the burden of

14  production even though they were not citizens but were lawful

15  immigrants who lived in the country for the last five years,

16  had no criminal record in the United States, and were gainfully

17  employed.  Only one of the defendants had a family member

18  located in the United States, but nonetheless the Seventh

19  Circuit found that because of, quote:

20        "Their economic and social stability coupled with the

21  absence of any relevant criminal conduct rebut the presumption

22  of detention."

23        We think that Mr. Al Safoo has an even greater

24  economic and social stability based on his family support here

25  in Chicago and coupled with that absence of any relevant

1  criminal conduct or anything else like a substance abuse
2  disorder that would counsel against release does rebut the
3  presumption.

4        THE COURT:  I mean, I see the argument as it applies
5  to danger -- or risk of flight.  How does it apply to danger to
6  the community?

7        MR. MEYER:  I think in large part, Judge, the danger
8  to the community prong is addressed by the fact that he doesn't
9  have any criminal conduct in his past, and what we have to
10  remember is that this analysis is a prospective analysis.  The
11  question is that if released will Mr. Al Safoo comply with the
12  conditions that this Court puts in place.  This is not a
13  retrospective analysis.  This is not an analysis about what
14  happened in this particular case or whether or not he's guilty
15  of the crime as charged.  I think those things do become
16  relevant later on when the Court is weighing further -- when
17  the Court is weighing whether or not the Government has met its
18  burden of persuasion.  But for the burden of presumption,
19  that's not an appropriate consideration.

20        THE COURT:  All right.  I haven't decided whether
21  you've rebutted the presumption, but let me hear from the
22  Government.  Argue your case.

23        MR. DIDWANIA:  Yes, Judge.  We have a presentation
24  that we'd like to make, and as part of that I'll specifically
25  address the points that defense counsel raised.  To just take

1   the obvious, the defendant is charged with providing material

2   support to ISIS, a foreign terrorist organization that has

3   committed attacks, violent attacks, violent jihadi attacks in

4   the United States and elsewhere.  So they are a significant

5   danger here, and I want to start with the danger to the

6   community and then return to risk of non-appearance.

7          Although the Court is familiar, obviously, with the

8   complaint and the allegations there, I want to start with the

9   defendant, who he is and what he's charged with.  He's charged

10  with being a leader of the Khattab Media Foundation, an

11  ISIS-affiliated group that has pledged allegiance to ISIS.  The

12  pledge stated that the Khattab members would listen and obey

13  ISIS and not dispute ISIS's leaders.  This pledge was made soon

14  after the defendant became a leader within Khattab.

15         His pledge, what's called a bayah, is a very

16  significant undertaking.  It means that the defendant and his

17  group are submitting to ISIS and to ISIS's cause and that

18  they'll act at the direction of ISIS and will not undermine

19  ISIS.  So they're declaring themselves to be the soldiers of

20  ISIS devoted to ensuring its success in the creation of a

21  caliphate, especially through violent jihad.  At bottom, it

22  means that the defendant has dedicated himself to working for

23  ISIS, a virulent group dedicated to mass killings.

24         The other important point here, Judge, is timing.  So

25  this is not conduct that we're talking about from a long time

1    ago, something that he dabbled in and then left and moved on

2    with his life.  All the allegations in the complaint contain

3    conduct within the past year, including very recently, and all

4    of the defendant's conduct in terrorizing others on behalf of

5    ISIS, recruiting soldiers, trying to recruit lone wolves to

6    conduct attacks are within the last year.  Days before his

7    arrest, Judge, defendant repledged allegiance, repledged bayah,

8    therefore, reaffirming his devotion.

9              THE COURT:  And what's your basis for that?

10             MR. DIDWANIA:  So, Judge, one of the things that we

11   recovered during the time of the arrest was the phone that the

12   defendant was actually using.  He was on the CTA train going to

13   work.  He was using a phone.  Officers recovered it, and

14   pursuant to a court-authorized search warrant we have been able

15   to search some of that phone.  So we have been able to recover

16   some of the communications and other information, other media

17   that was on the phone.  So if I could hand up, Your Honor --

18             THE COURT:  Did you provide a copy to defense counsel?

19             MR. DIDWANIA:  I have, Judge.

20             MR. MEYER:  We'll acknowledge receipt, Judge.

21             THE COURT:  Thank you.

22             MR. DIDWANIA:  Could I hand up Exhibit 1, Your Honor?

23             THE COURT:  Please.

24             MR. DIDWANIA:  These are communications that the

25   defendant had on a social media application that was recovered

1 | from his phone.  Obviously, this is all in Arabic, so I'll

2 | proffer, Your Honor, a summary translation because we've just

3 | been getting this information off the phone and we haven't been

4 | able to prepare translations.

5 | MR. MEYER:  Judge, if I can interject for just a

6 | moment, we certainly have received copies of these documents

7 | from the Government, and we appreciate them sending them over.

8 | However, as the Government just pointed out, a majority of the

9 | documents they intend to produce to you today are in Arabic.

10 | They have also proffered the same or what I believe are going

11 | to be the same translations or summaries to us that they intend

12 | to proffer to you.

13 | I do not speak Arabic, and we have not had an

14 | opportunity to do a deep dive on these.  So I don't know how

15 | much weight the Court should give to these, to these exhibits

16 | without actual certified translations attached to them.

17 | THE COURT:  That's a fair area of inquiry.  Can you

18 | just identify the basis of the translation?  Is this through

19 | the FBI?  Is this through a military source?  Where is the

20 | translation coming from?

21 | MR. DIDWANIA:  The translation is coming from FBI

22 | linguists and others at the FBI who are fluent in Arabic.

23 | THE COURT:  All right.  I think it's a fair point to

24 | raise, but the rules of evidence don't even apply here.  I do

25 | think that doesn't mean we shouldn't have some comfort with the

1   accuracy, but based on the representation that it's from

2   linguists familiar with the language who are employed by the

3   FBI, I'm comfortable relying on that.

4           MR. MEYER:  We understand that the rules of evidence

5   don't apply.  I think there's a difference between suggesting

6   that the rules of evidence don't apply and having a document

7   that's fully in a foreign language submitted to the Court.  I

8   understand that FBI linguists have looked over this.  I think

9   there's always color and context that is part of a

10  conversation.

11          THE COURT:  There very well may be.  I don't know what

12  it says.  It may be so obvious that any color and context

13  wouldn't matter, or it may be -- you know, my experience is

14  that especially in Arabic languages there's a lot of color and

15  context that you need to understand.  But I don't know what

16  it's going to say, so let's hear him out.

17          MR. MEYER:  We would just ask the Court to consider

18  that as it here, a proffer.

19          THE COURT:  I will.  That's a fair point.

20          Go ahead.

21          MR. DIDWANIA:  And, Your Honor, we provided these

22  exhibits to defense about a week ago.

23          THE COURT:  Okay.

24          MR. DIDWANIA:  So in summary, in these communications,

25  Your Honor, the defendant is communicating with another social

1  media user indicating that he wants to join another group,
2  Al-Battar, which is similar to --
3          THE COURT:  You mean the defendant.
4          MR. DIDWANIA:  That the defendant would like to join
5  another group, Al-Battar, which is similar to Khattab Media
6  Foundation, which is the group that he's charged with
7  conspiring with.  Then this other user informed us that he must
8  renew his pledge of allegiance to ISIS to join the Al-Battar
9  group.  Then on October 14th, 2018, days before his arrest,
10 Your Honor, Al Safoo responded that he would certainly do so,
11 but that he would only do it on the secret chat function for
12 security reasons.
13         Now, the secret chats are end-to-end encrypted and
14 self-destruct.  So Al Safoo understood the importance of
15 pledging allegiance and the possible consequences days before
16 his arrest.  He understood he was personally submitting to the
17 direction and control of ISIS.  He's declaring that he would do
18 ISIS's bidding, and he was sophisticated enough to know that he
19 couldn't do this over a normal chat, that he had to do it --
20         THE COURT:  What's your basis to say that the secret
21 chat self-destructs and is only in existence for a period of
22 time?
23         MR. DIDWANIA:  That's publicly available information
24 about the social media application, Judge, that we haven't
25 disclosed.

1          THE COURT:  Okay.  Continue.

2          MR. DIDWANIA:  That's a significant concern.  So if Al

3   Safoo were released, he could continue to engage in criminal

4   activity, sending threats, attempting to incite violence,

5   recruiting lone wolf attackers, all that were the purposes of

6   his conduct over the last year on behalf of ISIS.

7          Even more importantly, Judge, there would be no

8   ability to monitor that activity.  It's happening online.  It's

9   happening on an application that has encrypted communications

10  and that has communications that self-destruct.  So that is --

11  there are significant concerns about danger, and I'm going to

12  walk through additional evidence about that.

13         But even putting that aside, in terms of release,

14  there's an insurmountable goal here that on release he cannot

15  be monitored in his activities.  He will be engaging in these

16  activities on behalf of ISIS the way that he's done for the

17  past year over and over.  We have thousands of pages of

18  transcripts in these chat rooms online, pushing out threats to

19  people around the world, attempting to recruit soldiers,

20  attempting to recruit lone wolf attackers, and there's no

21  ability to monitor that.  That is a giant black hole that we

22  cannot allow.

23         THE COURT:  So, Mr. Meyer, how do -- that is a concern

24  I've had because of the nature, the circumstances and nature of

25  the conduct alleged.  Recognizing there's a presumption of

1   innocence, I can consider the nature and circumstances.  How

2   could I fashion conditions that would address the concern that

3   counsel has just raised?

4           MR. MEYER:  There are absolutely ways, Judge.  Number

5   one, we're not suggesting that the Court release him on some

6   sort of unsecured recognizance bond and just let him out into

7   the community.

8           THE COURT:  No, no, no.  All this was done on a cell

9   phone.  So, you know, as you know, sometimes people say you

10  can't have access to the Internet which is, you know -- quite

11  frankly, I'm not sure if that's even feasible in today's

12  environment, but certainly with your client's background that's

13  his area of expertise.

14          MR. MEYER:  Well, there's --

15          THE COURT:  So if anyone has a cell phone who's

16  willing to let him use their cell phone, how could we fashion

17  conditions to address that concern?

18          MR. MEYER:  There's two things about that, Judge, that

19  I'd like to address.  The first is kind of the practical

20  question that you're asking, which is how we take away his

21  access to the Internet.  We have had long conversations with

22  his father, which is who we are going to propose as a

23  third-party custodian.  His father is willing to have Mr. Al

24  Safoo come to the house and be on electronic monitoring and

25  home incarceration so that he cannot leave to go to and from

1    the house.  Mr. Al Safoo's father is willing to get rid of all
2    electronic equipment in the house, and his family is willing to
3    pledge to the Court that they will not allow him to have access
4    to any sort of electronic device.

5            If the Court is worried about cell phone usage, my
6    understanding is that there are programs that the pretrial
7    services office can install in order to monitor what is and is
8    not allowed or what is or is not being done on certain pieces
9    of electronic equipment.

10           The point is to take away his access.  Okay?  I
11   realize in today's day and age that may be more difficult to do
12   than it has in the past, but it's certainly not impossible.
13   Take away his access and have him be monitored very, very
14   carefully by the pretrial services office to keep on top of
15   him.

16           Now, the second part of this that I would like to
17   address -- and this may or may not be the appropriate time, but
18   it feels like it needs to be answered at this point -- is what
19   the Government is trying to allege here.  This is a
20   163-paragraph complaint that was sworn out, and there is some
21   very inflammatory content that is included in that complaint.
22   But of those 163 paragraphs, only 83 paragraphs are paragraphs
23   that Mr. Al Safoo's name appears in and that apply to him.

24           I took a look at the complaint again last night, and
25   of those 83 paragraphs, the remainder of which deal with ISIS

1    in kind of the abstract or general background information about
2    ISIS or general background information about Khattab or actions
3    that were taken by what the Government is calling unindicted
4    co-conspirators.  In the remaining 83 paragraphs in which
5    Mr. Al Safoo's name appears, seven of them are general
6    information or summaries on how the investigation unfolded.
7    Five of them are about the structure of the Khattab Media Group
8    generally.  Four of them are specifically about Mr. Al Safoo's
9    role in Mr. Khattab.  25 paragraphs are related to posts that
10   he made, things that he reposted, articles that he wrote, or
11   comments that he made about other people's posts on the
12   Internet.  Six of them deal with the use of social media
13   accounts in violation of the terms of use of the social media
14   provider, and 36 of them are simply linking Mr. Al Safoo to the
15   use of multiple e-mail or social media accounts.
16          Now to be clear, we are not admitting or conceding any
17   of the allegations in the complaint, but to the extent that the
18   Court is considering those things under the weight of the
19   evidence it is important to understand that even if the Court
20   considers the allegations in the complaint as true, the weight
21   of evidence of material support to a terrorist organization
22   here is not strong.  It is not clear at all to me that the
23   allegations that the Government has in the complaint constitute
24   material support.  We think that the types of things that are
25   alleged in the complaint are wide open for a constitutional

1  challenge, and we intend to vigorously pursue that.

2  In addition, even if that constitutional challenge
3  were rejected, we feel that there are strong trial issues here
4  that we want to address in a trial situation. So I'm not sure
5  the way the Government is characterizing the information that's
6  included in the complaint does any real good to the Court
7  except to try to inflame the Court as to what they say that
8  Mr. Al Safoo did.

9  THE COURT: All right. I can assure you I'm not
10  inflamed by anything, but I have read this complaint a couple
11  times. The numeric breakdown is not -- I get your point, and
12  if you tell me that there were five times he was mentioned in a
13  much broader conspiracy, I think there's something to that.
14  This complaint is focused on your client, and each paragraph
15  where he's not named informs the -- it is informative of the
16  general conduct involved.

17  I just happen to be at paragraph 62. Your client is
18  not named there, but it talks a lot about what Khattab did and
19  the point of the organization and what they were trying to get
20  done. So the Government in the complaint has linked your
21  client to the Khattab organization in a leadership capacity.
22  I'm not making a finding, but there's strong evidence to the
23  connection.

24  MR. MEYER: And we're not saying that in a trial
25  context that wouldn't be relevant or something that we would

1  have to defend against, but this is a detention context.  The

2  question before the Court is:  Are there indicia of things --

3  are there things there that are going to indicate to the Court

4  that Mr. Al Safoo will not comply with conditions of bond that

5  this Court sets?  I don't think that this material colors that

6  question, the ultimate question in a detention purpose.

7            What we have is someone --

8            THE COURT:  I just respectfully disagree with you.  I

9  don't think the inquiry is are there things to indicate to me

10  that he won't comply.  The issue is can there be a condition or

11  combination of conditions to either assure his appearance or

12  protect the safety of the public.  It's not an issue of whether

13  he'll comply or not.  That's, I guess, implicit in the

14  analysis.  But can I set a --

15            I'm getting back to the original question I had which

16  is access to the Internet.  First of all, from Ms. Neelin's

17  standpoint, does pretrial services have some technology that

18  would be able to tell you if he accessed the Internet at all?

19            MS. NEELIN:  Your Honor, in this district, the only

20  way we can monitor that condition would be to assure that the

21  Internet is not in the home, or any devices that can access the

22  Internet that there is a block on them.  But we do not in this

23  district have a program that can monitor Internet usage.

24            THE COURT:  Quite frankly, taking out a Wi-Fi server

25  does nothing to deal with digital access.  So if someone came

1    in with a cell phone, unless there was some jamming mechanism

2    that pretrial services has that they borrowed from NSA or

3    someone like that, anyone who brings a cell phone in can give

4    him access to the Internet.

5         MR. MEYER:  Which is why the family is willing to

6    pledge to you, Judge, that they won't or won't allow anyone to

7    come with that sort of technology into the home.

8         THE COURT:  Okay.  I know the father has a full-time

9    job and he's gone for extended periods of time, which is fine,

10   but under these circumstances -- and certainly I've released

11   people to parents who are working like the rest of it.  But in

12   this circumstance, he won't be there for a good amount of time.

13        MR. MEYER:  There is a brother who also resides in the

14   home who works overnight and would be present when Mr. Al

15   Safoo's father is not present.

16        THE COURT:  All right.  Let me kind of interrupt you

17   and let me finish with the Government, and then we'll come back

18   to you, Mr. Meyer.

19        Go ahead.

20        MR. DIDWANIA:  So, Your Honor, we certainly agree that

21   there's just no assurance that the defendant would never have

22   access to the Internet, especially in light of his

23   sophistication, the sophistication of his background in

24   technology and the sophistication that's laid out in the

25   complaint about his use of a variety of technical means to

1    evade law enforcement over the past year, VPN's and tour

2    services and things like that.

3          So those are already concerns, but let me talk about

4    something slightly different, not his online activity, but some

5    additional information that we found on the phone.  Could I

6    hand up, Judge, Exhibits 5 and 6?

7          THE COURT:  Has this been provided to defense counsel?

8          MR. DIDWANIA:  It has, Judge.

9          THE COURT:  All right.  Thank you.

10          MR. DIDWANIA:  These are also items that were --

11          THE COURT:  Have you gotten these?

12          MR. MEYER:  I have, Judge.

13          THE COURT:  Okay.

14          MR. DIDWANIA:  These are also items of photos that

15    were taken from the defendant's phone that he was using at the

16    time of his arrest.  With respect to Exhibit 5, Your Honor, I

17    consulted with a bomb technician at the FBI, and based on a

18    preliminary review of the photos I can proffer that it's our

19    understanding that these photos show how to mass produce

20    sleeves containing ball bearings that can then be inserted into

21    improvised exploding devices or IED's.

22          THE COURT:  Have you had the Arabic translated from

23    this one diagram?

24          MR. DIDWANIA:  Yes, Judge, again, a preliminary

25    translation.  I don't have it in front of me, so I'll have to

1  go off of memory.  It's my understanding that the Arabic that's

2  in the brackets just refers to figures, you know, Figure A,

3  Figure C.  But then the Arabic starting at the top left

4  pointing to the red circle says something to the extent of a

5  detonator.  Then the other Arabic, the next two are referring

6  to the combustible item that's inside, and then the last one is

7  referring to the shape that should be the ball bearing sleeve.

8           THE COURT:  And this was found on the defendant's

9  phone?

10           MR. DIDWANIA:  On the defendant's phone, Your Honor.

11           THE COURT:  And the photographs, do you know where on

12  the phone itself?

13           MR. DIDWANIA:  Unfortunately we don't have the

14  context.  We're trying to understand the context for these

15  photos.

16           THE COURT:  All right.  Then Exhibit 6, can you review

17  that for me?

18           MR. DIDWANIA:  Exhibit 6, again, I'll proffer this

19  summary translation.  Our understanding is that this is the

20  front page of a manual, and it states something to the extent

21  of "workshop on the creation of cylindrical IED's."

22           THE COURT:  All right.  We'll delay your risk of

23  flight argument.  Can you address danger to the community in

24  light of this information?

25           MR. MEYER:  I can, Judge.  Number one, I think as the

1  Government just conceded to you, we don't have any context for

2  these photos.  There are a number of Internet-based programs

3  that automatically download photos based on protocols that are

4  set on someone's phone or on their social media account for

5  that device or that software.

6          THE COURT:  And you'd agree with me those protocols

7  generally are driven by some algorithm that reflects either the

8  user's predetermined desires or use of the Internet.

9          MR. MEYER:  I think that they -- as far as I'm willing

10  to go, Judge, is that they are based on whether or not the

11  person is connected to the program, and the person who is

12  receiving the downloads has no control over what other people

13  are posting on the site and what is automatically being

14  downloaded to them.  This arises in a much different context in

15  other cases that we see at the Federal Defender's office.

16          THE COURT:  Okay.

17          MR. MEYER:  What I will say is absent from this,

18  although these images are on his phone in an unknown

19  context, there has been a thorough investigation of both his

20  home and him, and there is no allegation on the part of the

21  Government that there was ever any concrete step taken or any

22  materials present to engage in any sort of action related to

23  these photos.  There was simply nothing when they executed the

24  search warrant at his house that would indicate that there was

25  an imminent danger to the community or that he was involved in

1   any type of behavior related to these photos.  I think --

2           THE COURT:  But you agree that imminent danger to the

3   community is not the standard that the Government needs to

4   prove.

5           MR. MEYER:  No, but I think that's what they're trying

6   to imply, that there is this danger to the community that would

7   happen if this Court were to release Mr. Al Safoo.  Aside from

8   photos on his phone in an unknown context, there's simply no

9   other evidence to corroborate that sort of inference.

10          THE COURT:  Okay.  I think if you took each piece in

11  isolation you can make that argument, but it's not taken in

12  isolation.  They have a how-many-paragraph complaint that

13  outlines his relationship.

14          MR. MEYER:  But nothing in that complaint deals with

15  photos of this type or specifically photos of this type on his

16  phone.  There are certainly general allegations in the

17  complaint about what is supposed to be happening, but there's

18  nothing specific to him or these images on his phone.

19          THE COURT:  I accept that.  I think that's generally

20  correct at this point.  Okay.  I'm --

21          MR. MEYER:  I'd like to say this, Judge.

22          THE COURT:  Okay.  Go ahead.

23          MR. MEYER:  I think it's instructive to look at other

24  material support cases that have been brought in this district

25  in the past, particularly in the detention context, and I'm

1    referring to the Tounisi case.  Pardon me for just a moment.  I
2    have the citation to it.  It's 13 CR 328, United States versus
3    Abdella Ahmad Tounisi.  This is a case in which Magistrate
4    Judge Martin initially granted conditions of release to
5    Mr. Tounisi.  The Government took an appeal to Judge Chang, and
6    Judge Chang reversed Judge Martin.

7          Now, it may seem odd that I'm citing a case in which
8    the magistrate judge was reversed, but this is the point I'd
9    like to make about that.  In Judge Chang's opinion, he conceded
10   that Judge Martin was a well-respected and careful jurist, and
11   I don't think anybody here would say anything different about
12   Judge Chang other than that he is also a well-respected and
13   careful jurist.

14         So in that case you have two very highly regarded
15   judges who came to different opinions about whether or not
16   someone could be granted bond.  That is by definition a close
17   case, and this case is worlds different than that case.  None
18   of the things that gave Judge Chang pause in that case and led
19   him to reverse Judge Martin are present here.

20         In that case, Mr. Tounisi had not heeded family and
21   community warnings nor what, as Judge Chang said, should have
22   been a life-altering interview with the FBI.  Instead -- and
23   Judge Chang found this most important of all -- Mr. Tounisi
24   after those things was traveling to Syria via Turkey in order
25   to join in, quote-unquote, the battlefields.

1       This is a very different case.  There are no
2    allegations that Mr. Al Safoo was involved in an imminent plot
3    in the United States or that he was attempting to leave the
4    country to join hostilities somewhere else in the world.  What
5    we have here is someone who, when you really do boil this
6    complaint down to what it is, was sitting behind a keyboard
7    with access to the Internet.

8       If you take away that access to the Internet, you have
9    imposed a condition of bond that will reasonably assure the
10   safety of the community, which is the standard.  In addition to
11   that, we are prepared to propose to the Court a number of other
12   conditions, including things that I've already mentioned like
13   home incarceration, electronic monitoring, and the family is
14   willing to post a substantial amount of cash as collateral for
15   Mr. Al Safoo's release as a show of sincere faith that he will
16   abide by whatever conditions this Court imposes.

17      THE COURT:  All right.  I appreciate everyone's
18   presentations.  I'm going to order the defendant detained.
19   I'll go over my reasons now, and then issue a written order as
20   well.  Under the law, the Government has -- first of all, it's
21   by agreement and both sides acknowledge it's a rebuttable
22   presumption case.

23      The first question I have to answer is whether that
24   presumption was rebutted.  As to risk of flight, I think it was
25   rebutted through the factors you've outlined, Mr. Meyer,

1   including the defendant's family ties, his employment, that he

2   is a citizen of the country, lack of criminal history, you

3   know, no abuse of alcohol or drugs in his background.  I think

4   that rebuts the presumption as it applies to risk of flight.

5           But danger to the community, I find it has not been

6   rebutted.  Although, Mr. Meyer, in your argument I think you

7   incorporated the other factors I just reviewed, but you also

8   noted the defendant lacks criminal history, which is true but

9   the statute doesn't talk in terms of criminal history.  It says

10  if someone is charged with one of these offenses there's a

11  rebuttable presumption.  It doesn't say that they have to have

12  a criminal history.  So the fact that he has no criminal

13  history can't be the rebuttable factor.

14          In any event, I look at the other arguments you

15  posited as to risk of flight, and to me those do not rebut the

16  presumption -- the danger to the community based on the nature

17  and circumstances of this offense, and in particular as to your

18  client because it is -- as you noted, the crime was committed

19  through the use of technology.  The alleged crime was committed

20  through the use of technology, and your client has great skill

21  in the area.

22          So the idea that danger to the community is rebutted

23  because he has no criminal history, one, I think is in tension

24  with the statutory language and construct and, two, really

25  doesn't answer the question at hand, which is how could his

1   conduct, his alleged conduct and his potential risk be

2   protected against.  Simply lack of criminal history won't do

3   it, nor would any of the factors that you've identified.  That

4   does not rebut the presumption in my mind.

5        But even if it did rebut the presumption, I would

6   still say that danger to the community has been established by

7   clear and convincing evidence.  That evidence includes in

8   particular Exhibits 1 and 5 that the Government tendered.  I

9   appreciate that things end up on people's phones that people

10  may not want to get on their phones and that they have no

11  intention of it being there.

12       In this case, I find it hard -- it is in tension with

13  the evidence in the complaint that these images related to and

14  construction of a bomb just ended up showing up there.  That

15  seems in light of your client's other alleged Internet

16  connections as defined in the complaint, it seems a strange

17  circumstance that those images happened there by happenstance.

18  Therefore, that fact alone, I think if I were not to apply the

19  presumption, I would find that there's no condition or

20  combination of conditions to protect the community because

21  access to the Internet cannot be controlled.

22       I understand the family and I respect that the family

23  is willing to post property, that they're willing to serve as a

24  third-party custodian, but the ready access to the Internet in

25  the most really mundane ways you can get onto the Internet, if

1   he has to use the bathroom and takes the phone in there, no one

2   is going be there watching him.  I mean, the idea that that is

3   what would need to be done to assure the safety of the

4   community, which I think it is what needs to be done, we would

5   be completely -- or I wouldn't be completely confident he

6   couldn't have access to the Internet.  The only way seemingly

7   for me to assure that is by a custodial setting.

8          I also rely on the fact that the Government posited

9   evidence that the defendant was actively involved in his role

10  within the Khattab and his willingness to pledge his allegiance

11  to ISIS and that it was done in the context of being cognizant

12  of Internet technology and the ability to surveil him on the

13  Internet in the way that the message itself would be secret and

14  destructed in a period of time.

15         For all of those reasons, I find that there's no

16  condition or combination of conditions that would assure the

17  safety of the public even if the rebuttable presumption did not

18  apply.  As I said, I'll issue a written opinion as well.

19         Is there anything further from the Government?

20         MR. DIDWANIA:  Yes, Your Honor.  I did have a brief

21  presentation on risk of non-appearance, if I could just very

22  briefly proffer the information that I was going to proffer for

23  the record on our view on why there's a risk of non-appearance.

24         THE COURT:  Sure.

25         MR. DIDWANIA:  One, in terms of employment, it's our

1   understanding that he has been fired or very imminently will be

2   fired from his employment.  He has extensive ties overseas as

3   detailed in the pretrial report.  His wife has extensive ties

4   overseas, and during an interview with the Government she

5   informed the Government that she intended to go overseas very

6   soon to see her father who was sick.

7           Finally, Judge, on February 23rd of this year, the

8   defendant had an extensive conversation with an undercover FBI

9   agent in which he indicated his desire to do nafir or to go

10  overseas to Iraq to conduct jihad on behalf of ISIS.

11          THE COURT:  All right.

12          MR. DIDWANIA:  I can detail that conversation,

13  obviously, if you'd like, Judge.

14          THE COURT:  Mr. Meyer?

15          MR. MEYER:  Judge, you've already ruled.  I'm not

16  exactly sure what the point of that was, so I'm not going to

17  address it.

18          THE COURT:  Okay.  Certainly if there's an appeal,

19  another judge might want to hear that.  I'm just trying to get

20  to the point of where we are now.

21          All right.  You waived preliminary hearing, correct?

22          MR. MEYER:  We did, Judge.

23          THE COURT:  All right.  Defendant will be remanded to

24  the custody of the United States Marshal's Service and held

25  over to appear before the district court in further proceedings

1    as necessary.

2            MR. MEYER:  Judge, there was one other matter.  We had

3    initially moved at the last hearing for subpoena power.

4            THE COURT:  Right.

5            MR. MEYER:  We have received the early discovery that

6    we requested from the Government, and that was part of our

7    agreement for waiving preliminary hearing.  Based on that,

8    we're withdrawing our request now.

9            THE COURT:  Okay.  That will be noted on the record.

10   I know that you just submitted a protective order, is that

11   right?

12           MR. DIDWANIA:  Yes, Your Honor.

13           THE COURT:  So we'll get that out today.

14           MR. DIDWANIA:  Thank you, Judge.

15           THE COURT:  All right.  Thank you very much.

16       (Proceedings concluded.)

17            C E R T I F I C A T E

18           I, Patrick J. Mullen, do hereby certify the foregoing
     is an accurate transcript produced from an audio recording of
19   the proceedings had in the above-entitled case before the
     Honorable M. DAVID WEISMAN, one of the magistrate judges of
20   said court, at Chicago, Illinois, on October 31, 2018.

21                          /s/ Patrick J. Mullen
                            Official Court Reporter
22                          United States District Court
                            Northern District of Illinois
23                          Eastern Division

24

25