```
 1                  IN THE UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3
    UNITED STATES OF AMERICA,        ) Docket No. 18 CR 696-1
 4                                   )
           Government,               )
 5                                   ) Chicago, Illinois
                vs.                  ) September 26, 2019
 6                                   ) 1:30 o'clock p.m.
    ASHRAF AL SAFOO (1),             )
 7                                   )
           Defendant.               )
 8
              TRANSCRIPT OF PROCEEDINGS - Detention Hearing
 9            BEFORE THE HONORABLE JOHN ROBERT BLAKEY

10  APPEARANCES:
    For the Government:       UNITED STATES ATTORNEY'S OFFICE
11                            BY:  MR. BARRY JONAS
                                   MS. MELODY WELLS
12                                 MR. PETER S. SALIB
                              219 South Dearborn Street
13                            Suite 500
                              Chicago, Illinois  60604
14
    For the Defendant:        DURKIN & ROBERTS
15                            BY:  MR. THOMAS A. DURKIN
                              515 West Arlington Place
16                            Chicago, Illinois  60614

17                            LAW OFFICE OF JOSHUA G. HERMAN
                              BY:  MR. JOSHUA G. HERMAN
18                            53 West Jackson Boulevard
                              Suite 457
19                            Chicago, Illinois  60604

20  ALSO PRESENT:             U.S. PRETRIAL SERVICES
                              BY:  MS. HEATHER MULRY
21                            219 South Dearborn Street
                              Room 15100
22                            Chicago, Illinois  60604

23              Laura LaCien, CSR, RMR, CRR
                     Official Court Reporter
24         219 South Dearborn Street, Suite 1212
                  Chicago, Illinois  60604
25                     (312) 408-5032
```

```
 1        (The following proceedings were had in open court:)
 2              COURTROOM DEPUTY:  18 CR 696-1, USA versus Al Safoo.
 3              MS. WELLS:  Good afternoon, your Honor.  Melody
 4   Wells, Barry Jonas and Peter Salib for the United States.
 5              THE COURT:  Good afternoon, counsel.
 6              MR. DURKIN:  Good afternoon, Judge.  Tom Durkin and
 7   Joshua Herman on behalf of the defendant who is present and
 8   in custody.  And, Judge, with us at counsel table are our two
 9   law clerks, Loyola students of mine, Gabriella Hidalgo and
10   Blake --
11              THE COURT:  Would they like to make appearances?
12              MR. DURKIN:  Pardon me?
13              THE COURT:  Would they like to make appearances?
14              MR. DURKIN:  They'd like to not take the bar and be
15   able to appear.
16              THE COURT:  All right.  Well --
17              MR. DURKIN:  I think they'll accept the fact if you
18   let them sit at counsel table, that will be good enough for
19   them.
20              THE COURT:  All right.  Excellent.  Tell them they
21   are welcome.
22              MS. MULRY:  Good afternoon, your Honor.  Heather
23   Mulry.  I'm appearing for Officer Ashley Simon with U.S.
24   Pretrial Services.
25              THE COURT:  Great.  Thanks so much.  I know there
```

1    was a recent supplement.  Did everyone have an opportunity to

2    see that?

3              MS. WELLS:  Yes, your Honor.

4              MR. DURKIN:  The supplemental --

5              THE COURT:  Yeah, from Pretrial.

6              MR. DURKIN:  Pretrial, yes.  Yes.

7              THE COURT:  Okay, great.  Are the parties prepared

8    for a detention hearing?

9              MS. WELLS:  We are, your Honor.

10             THE COURT:  All right.  Any additional testimony and

11   evidence?  I've reviewed the submissions of the parties and

12   the transcripts from the proceedings in front of Judge

13   Weisman.  Is there anything else, any other or are we just

14   arguing?

15             MS. WELLS:  The government is planning to argue,

16   your Honor.

17             THE COURT:  Okay.  What about you, counsel?

18             MR. DURKIN:  I think we can just argue, Judge.

19        (Brief pause.)

20             MR. DURKIN:  Judge, I don't think we need to call

21   any witnesses at this time.  However, his mother is here.

22   That's an issue that we addressed as part of the conditions

23   of third-party supervision and she's prepared to move into

24   the house so that there is 24/7 presence in the home with a

25   third-party custodian.  If you would like to talk to her,

1    it's really up to you.

2           THE COURT:  All right.  I'm prepared to accept the

3    proffer of the attorneys.

4           MR. DURKIN:  That's fine.

5           THE COURT:  So if -- unless the government needs to

6    make an inquiry, the Court is satisfied with the proffer.

7           MS. WELLS:  Not at this time, your Honor.

8           THE COURT:  Okay.  All right.  Counsel, it's your

9    motion.

10          MR. DURKIN:  Judge, could we -- if you don't mind,

11   I'd like to break this up into two parts so that Mr. Herman

12   can address the more specifics of the evidence.  I'd like to

13   just start out with a couple of more general observations

14   that we raise both in the introduction to our pleading and

15   another section which is the section under the presumption of

16   innocence, which would be covered under arguments, Paragraph

17   III under 3142(g) factors, but essentially dialing in to the

18   whole issue of the presumption of innocence.

19          I didn't mean to be flippant but I believe what

20   we're creating is a terrorism presumption of detention.

21   There are so few cases in which a terrorism defendant gets

22   bond, and I don't have all the statistics in front of me, but

23   suffice it to say there are slim to none, very, very few

24   cases.  And I think in what's happening in all of these cases

25   is that they are reading the presumption of innocence

1    section, the very last section of the Bail Reform Act right

2    out of existence, that nothing in this chapter should

3    influence the presumption of innocence.  And unless we want

4    to just pretend and continue to just pay lip service to that,

5    this is a case where release is appropriate.

6         This is not some foreign national.  This is not

7    somebody who swore allegiance to ISIS; and Mr. Herman is

8    going to address that because it's not -- it's not even the

9    organization.  There's a different organization that they've

10   listed -- I think it's on Page 14 of their pleading -- with

11   respect to a group that is the official spokesperson for

12   ISIS.  Al-Khattab, the group that he's affiliated with, is

13   not the official spokesperson -- spokespeople or press people

14   for ISIS.  That's this group Al-Mujab, is it?

15             MR. HERMAN:  Hayat.

16             MR. DURKIN:  Al-Hayat.

17             MR. HERMAN:  H-a-y-a-t.

18             MR. DURKIN:  And the significance of all that is

19   that this is not someone who is actively engaged in

20   terrorism.  He may, giving them the benefit of the doubt,

21   have been engaged in ISIS beliefs, endorsement of ISIS, and

22   so forth; but as we've suggested to you, that is -- those are

23   issues that are arguably protected by the First Amendment.

24   And I think the government has a long way to go before they

25   should be able to convince you that they have an overwhelming

1  case of material support via this type of advocacy and I

2  think we're going to get into *Holder versus Humanitarian* law

3  considerably.

4        But more importantly, and this is where I am

5  becoming so frustrated in working with these cases, you know

6  that we were before you on the Achmed case.  Remember the

7  case that it's now been transferred to you from Ohio that we

8  came in on with the computer-monitoring program?

9        THE COURT:  Yes.  I remember the case.

10        MR. DURKIN:  Well, we said in our pleading that this

11  is now available to the Probation Department and I think it's

12  a fairly persuasive argument that if it's -- if that

13  computer-monitoring system, which they so highly tout and

14  advocate and it's the same system that they use for sex

15  offenders, in the post -- if it's sufficient for

16  post-supervision, post-criminal conviction supervision, how

17  can it not be reasonably sufficient under the presumption of

18  innocence and under 3142(g)?

19        The only argument they advance in light -- to get

20  around that is to say it's not available for Pretrial

21  Service.  Now, you know, I don't know what that means.  I'll

22  take Pretrial Services' word for it that it's not available

23  but I don't know why and I don't know why this Court couldn't

24  order it to be available.  And under these very unique facts,

25  that should solve the problem.

1          Now they spend a lot of time talking about how
2   sophisticated he is but they don't address the sophistication
3   of their own system that when it comes time for them to be
4   advocating in a post-conviction setting, that this is
5   necessary because it's so good and it's so effective.
6   Remember I was advancing the argument that isn't this a
7   little overbroad and their argument was we need it to be so
8   overbroad because you never can be sure and that this system
9   is so good?  Well, one of the great things about the war on
10  terror is it goes on long enough -- and it's certainly been
11  going on a long time -- is that sooner or later these
12  positions they start getting contradictory to each other.
13  And I -- I just do not understand how these conditions, now
14  that we've satisfied Judge -- Magistrate Judge Weisman's
15  concern about the 24/7, and I do think I'm correct that he
16  read reasonable right out of the standard with respect to the
17  conditions, you know, it only has to be reasonably be
18  assured.  We don't have to, you know, beyond any
19  infinitesimal doubt be assured that nothing could happen.
20          But what I find so ridiculous in this case is that,
21  what, the worst that happens is that he begins advocating for
22  ISIS again?  I mean, that's a sufficient danger to the
23  community that we should ignore the presumption of innocence
24  and I just think it's wrong.  I think they're just dead wrong
25  on that and I don't think that we should continue to just

1    read the presumption of innocence out of this statute.

2    That's what's happening in these cases. And they do it the

3    same way. They dump all this stuff, you know, oh, my God,

4    look at these pictures. You know, do you want to be the guy

5    that lets this guy out who had these pictures on his computer

6    and -- I mean, that's what this is. This is oh, my God, look

7    at this, look, look here.

8          And I'd like it if Mr. Herman can address some of

9    the issues with respect to the ability of them to connect

10   what's on his phone necessarily to what's in his head, which

11   there's a distinction which I trust you can understand. You

12   know, if somebody would look at my phone, I suppose, or my

13   computer, there would probably be a lot of this on there too

14   because I have a reason to look for those things in my

15   business but that doesn't mean that I endorse those things;

16   but I'd prefer that Mr. Herman can address that.

17         But all these other pictures, you know, the

18   bomb-making, the 9-11, you know, the guy holding the head.

19   This is one that comes up virtually all the time in these

20   cases, this one that's in Exhibit 13. It's towards the back.

21   They're not individually numbered but it's after all the

22   pictures of the pressure-cooker bomb, which I guess should

23   scare us all. But you've got the picture of the burning

24   Towers of September 11th and you've got the iconic picture of

25   the remains of the building. And then the third picture,

1    this one, holding the head.  I mean, that's -- I guess that

2    means anybody that would even have that picture is just too

3    dangerous to let out and we're -- regardless of whether we're

4    putting them in the criminal justice system, we're going to

5    have different rules; and that's the other thing I want to

6    address.

7            These are the things that are happening in these

8    cases.  We are getting different rules for these cases.  And

9    this is the kind of stuff that does it because all of the

10   sudden we got to be concerned because if you're the guy that

11   lets him out and somehow he gets out and walks down in the

12   subway, you'll get blamed and I don't think that's what our

13   system is designed to do.  You know, it's ironic that

14   murderers get bond frequently but people charged with these

15   offenses don't.

16           And I -- you know, in most of these cases I don't

17   get as agitated because more of the cases are cases where

18   somebody deliberately did something.  They either wanted to

19   go join ISIS, they wanted to go fight overseas, they actively

20   did something that was a tangible kind of assistance -- it

21   wasn't propaganda -- or somebody who sends money and so

22   forth.  This is -- there are defenses to this case.  We have

23   defenses.  There are some significant First Amendment

24   concerns here that I think is going to affect the

25   government's evidence.

1           But the other thing that they -- and I'm
2    disappointed that they so readily discard, which is this
3    argument over the Sixth Amendment counsel of choice, their
4    solution to that is not to modify the order or anything else
5    that would help remedy that and if I take it correctly their
6    argument is that if somebody at the MCC were to see these
7    pictures somehow they might be radicalized in the MCC.
8    That's another argument to let him out if that's what they're
9    so worried about but they don't always follow the logic of
10   their own arguments.  But they just discount the idea of
11   counsel of choice by suggesting, well, that's too bad, it's
12   going to cost three times the amount it would cost, you can
13   just appoint him, Judge.  Well, we're not looking for an
14   appointment.  I mean, you know, we may have to get one but
15   that's not why we took this case and we're not looking for an
16   appointment.  We're looking for reasonable conditions of
17   release that would avoid this Sixth Amendment problem.  And I
18   can assure you that he won't be getting on the internet if he
19   comes to our office and tries to -- he won't be getting on
20   the internet and it would cut down on the cost dramatically
21   so I'll leave it that.  But I would like Mr. Herman, if you
22   don't mind --
23           THE COURT:  Of course.
24           MR. DURKIN:  -- to address some of the evidentiary
25   issues.

1          MR. HERMAN:  Judge, just to pick up on one thing

2     that Mr. Durkin left off on, it's not just a matter of

3     cost -- and I think our motion makes it clear -- there's a

4     whole category of information that we simply cannot review

5     with Mr. Al Safoo based on what is on and the government's

6     response is that we can identify what we would like and there

7     have been modifications to the protective order so we can see

8     things but I don't think defense counsel should be in a

9     position where we have to pick and choose what we'd like to

10    be able to show Mr. Al Safoo.  I think he's entitled to see

11    all of the discovery that's been produced and if --

12          THE COURT:  Other than the classified, right?

13          MR. HERMAN:  Of course.

14          THE COURT:  Yeah, okay.

15          MR. HERMAN:  Other than the classified material.  So

16    if something is on a hard drive or a bluetooth or a Blu-ray

17    and we've, I think, exhausted all measures with the MCC, I

18    don't think the onus is on us to say, well, I'd like these

19    ten pages, can you please print them out.  And, you know, I

20    understand there may be some logistical issues with media but

21    I don't think that's our problem and I don't think Mr. Al

22    Safoo should suffer and not be able to review all the

23    evidence in this case especially given the technical nature

24    of some of it and the language issues which put us at a

25    severe disadvantage.

1           But speaking to the merits of our motion that
2   Mr. Durkin didn't -- did not touch on, let's reframe this,
3   right.  The question is are there conditions that can be
4   crafted to reasonably assure the safety of the community and
5   what -- that's a question begging analysis.  What are we
6   protecting the community from here, right?  And the
7   government has as it did at the initial bond hearing and now
8   it expanded on his parade of horribles for everything that
9   ISIS has ever done.  And we're not going to sit here and say,
10  well, you know, there's actually a silver lining to the, you
11  know, to Exhibit 18 or something like that.  This is not
12  Mr. Al Safoo's image.  He has no control over who created
13  that image.  If you want to look at what Mr. Al Safoo did in
14  the group as a writer and what he actually personally did as
15  opposed to some type of conspiratorial liability for people
16  who he never even met or knew the real names for, there's an
17  article that's at Page 10 -- or, excuse me, Exhibit 10.  It's
18  a four- or five-page article that is extraordinarily dense
19  and if anybody can make heads or tails of it in terms of
20  its -- sitting up here and say explain to us, and explain to
21  you more importantly, how is this going to pose a danger to
22  people in the community, then perhaps we'll sit down, okay,
23  but it's -- this is what the Court should be concerned about,
24  not the exhibits of a headless santa.
25          THE COURT:  What exactly -- which page are you on?

1          MR. HERMAN:  This is Exhibit 10, 10T, your Honor --

2          THE COURT:  10T, okay.  Go ahead.

3          MR. HERMAN:  -- of the government's binder.  And if

4    the government had not included one of Mr. Al Safoo's actual

5    writings, we would have given you something that he actually

6    had written.  And this one is called Refuting Falsehoods,

7    Distortions, The Allegiance of the Arab Rulers to the

8    Infidels against the Muslims.  And there's reference to

9    something -- another article that he had written about not

10   joining the United Nations or Arab -- why Arab nations should

11   not join the United Nations.  These articles are more of a

12   political and religious nature and that's what the government

13   wants you to not pay attention to and instead look at the

14   grisly and ghastly images.

15          In the *Holder* case which we have cited, Chief

16   Justice Roberts wrote, and I believe this is -- I don't have

17   the exact pinpoint.  It looks like star 31, 561 at 31.  The

18   statute reaches only material support coordinated with or

19   under the direction of a designated foreign terrorist

20   organization.  Independent advocacy that might be viewed as

21   promoting the group's legitimacy is not covered.  We cite in

22   our motion as well on Page 17 an FBI report that begins as of

23   May -- 1 May 2018, the Khattab Media Foundation, an

24   independent media group has been producing audio/visual and

25   written media in support of the Islamic State of Iraq and

1    Asham, Asham, ISIS.

2              This is a very unique case, your Honor, from the

3    perspective that there is an independent media group with

4    somebody associated with that media group, not as we will

5    show -- believe the evidence will show, was working under the

6    direct control or supervision or coordination of ISIS, is

7    being prosecuted for political and religious viewpoints.

8    They may be very unpopular but that's what this case is

9    about.

10             And we want to also thank the government for

11   pointing out, as Mr. Durkin noted, the reference at Page 15

12   to its -- the Al-Hayat, quote, an official media arm of ISIS.

13             I'll note also that if you look at the website link

14   that they put here from the Federal Notice of Register -- and

15   we've marked this as an exhibit and can -- it's straight off

16   the Federal Register -- Al-Hayat was not designated as an

17   alias of ISIS under the INA until March of 2019 so this is

18   also after Mr. Al Safoo has been already locked up.  But

19   regardless, it is the official media arm of ISIS.  There's no

20   unofficial.  There's the official and everything else.

21             So the government can point to expressions of

22   affinity towards some of the political objectives of ISIS in

23   this binder and say look here, he likes ISIS, look there, he

24   likes ISIS but the Supreme Court itself has said that

25   independent advocacy in that manner is not illegal.

1    I'm sure the government will also point to these, as

2 it did at the initial bond hearing, pictures of bombs or

3 instructions.  What it won't point to is any shred of

4 evidence that Mr. Al Safoo was actively seeking out that type

5 of information nor will it be able to show that he was

6 actively disseminating that type of information independent

7 of anything else that it appeared in and so let me explain.

8 There's an exhibit, I believe it's Exhibit 15, in the

9 government's binder and on the last page of the binder -- and

10 this is for another magazine, it looks like, or periodical

11 called Al-Anfal.  And on the last page of this Al-Anfal

12 magazine, there appears to be -- I believe it's in -- it's

13 kind of a How To for acetone peroxide, okay.  And the

14 government will say, look, look, there's bomb-making

15 instructions on his phone even though it looks to be on Page

16 12 of a magazine that's on his phone that was at some point

17 downloaded.

18    I'd like to point out that when I was trying to

19 understand what acetone peroxide was in coming in, I found an

20 article from June 7th -- excuse me, September which I'll mark

21 as Defendant's Exhibit No. 1, and I can hand a copy --

22    THE COURT:  Sure.

23    MR. HERMAN:  Thank you.  This is Defense Exhibit No.

24 1 which is from the Daily Mail UK dated September 7th --

25 19th, 2017.  Horrific ISIS instruction video showing how to

1    make device likes Parson Green bucket bomb still on Google.

2    And I'll submit to you if you can look at the third page,

3    there's a still of a video where you can actually still

4    access this video of somebody -- and it doesn't appear to be

5    all of the instructions but of somebody now this is on my

6    phone or my computer of these bomb-making instructions.

7              And it's -- it's the entire -- the entirety of the

8    government's argument here is, is that he has somewhere on

9    his phone bomb-making instructions does not make him violent

10   in that manner and that's the question.  If you will look at

11   the words that he actually wrote even if they're supporting a

12   political agenda of ISIS, this is not somebody who is saying

13   this is how you make a bomb, let's go make a bomb, let's do

14   these types of things.

15             In the analysis the weight of the evidence is, we

16   acknowledge, one of the lower-pronged considerations but here

17   we think that this -- these points that I'm making, and I'm

18   not going to go through every exhibit because I think your

19   Honor gets our point, the analysis dovetails with the

20   question about conditions because as I said in the beginning

21   it's a question begging analysis, what are we protecting the

22   community from.  And here, we're not protecting it from some

23   bomber.  We're not protecting it from somebody who is going

24   to do harm to others.  We're protecting it from somebody who

25   used words.  Thank you.

1           THE COURT:  Thank you.  Counsel, response?

2           MS. WELLS:  Thank you, your Honor.  The defendant in

3    this case had a massive collection of videos, infographics

4    and other information that specifically glorified violence

5    against ISIS' enemies and these items specifically attempted

6    to incite violence and attacks in the West, including

7    martyrdom operations --

8           MR. HERMAN:  I'm sorry to interrupt but can we --

9    can Mr. Al Safoo sit down?

10          THE COURT:  Yeah, you can sit down.

11          MS. WELLS:  Oh, of course.

12          THE COURT:  Everybody can sit down.  Anyone who

13   needs to sit down, go ahead.

14          MS. WELLS:  The materials included videos and

15   infographics and other things that attempted to incite

16   attacks on the West, including lone wolf attacks, martyrdom

17   operations and the like.  We have mentioned that the

18   defendant had not one, not two, but at least three different

19   sets of bomb-making instructions on his phone.  Contrary to

20   defense counsel's statement, I don't think watching a video

21   online puts it on your device.  Okay.  We're talking about

22   documents that were saved, PDF documents that were saved.

23   One of those, in fact, is a magazine that the defendant

24   contributed an article to and so he's writing for magazines

25   that in the same issue published bomb-making instructions.

```
 1            THE COURT:  Did he disseminate the bomb-making to
 2   anyone?
 3            MS. WELLS:  Not -- we are not representing that,
 4   your Honor, but we think he is aware of that information and
 5   collected that information.
 6            THE COURT:  All right.  So he collected it on three
 7   occasions but you don't -- after looking at his phone, you
 8   didn't have any evidence that he disseminated to anyone?
 9            MS. WELLS:  Not to my knowledge.
10            THE COURT:  Okay.  Go ahead.
11            MS. WELLS:  And to put the information of this case
12   in context, before his arrest, the defendant was actively
13   engaged in material support of ISIS.  He did something
14   contrary to what defense counsel would have the Court
15   believe.  The defendant was the leader of Khattab.  This was
16   a sophisticated organization that did a bunch of different
17   things.  It created, it translated, it photoshopped, it video
18   edited, it audio edited a number of different pieces of
19   pro-ISIS propaganda directly in conjunction with ISIS at
20   their instruction.  They were well aware of what
21   organizations like Hayat, the official ISIS media, and Amaq,
22   the official ISIS media, were doing and they were operating
23   consistent with and at the instruction of those outfits.
24            THE COURT:  Is there any material support other than
25   propaganda?
```

1          MS. WELLS:  Yes, your Honor.  As alleged -- as

2   alleged in the indictment, he is charged with providing

3   material support in the form of services and personnel,

4   personnel including himself and the other members of the

5   conspiracy.

6          THE COURT:  Well --

7          MS. WELLS:  The services --

8          THE COURT:  Well, hang on a second.  Personnel to

9   work on the propaganda or to do something else?

10          MS. WELLS:  As members of Khattab, yes.  That's

11   correct.  But among the things that they did --

12          THE COURT:  Well, what does the non-propaganda

13   support?

14          MS. WELLS:  Well, it is the government's position

15   that the creation of this organization involved services that

16   go beyond ideas.  I think that's the --

17          THE COURT:  Okay.  And I'm asking you what those

18   are.

19          MS. WELLS:  Those are the technical support.  So we

20   have production -- we have production divisions, we have

21   editing, video, audio --

22          THE COURT:  Okay.  That all sounds like propaganda

23   to me so try to get beyond --

24          MS. WELLS:  We also --

25          THE COURT:  Hang on a second.  Hang on a second.

1    Sometimes I have to interrupt.  I hate that but it's part of

2    my job.  We can't talk at the same time.

3          Tell me about the services that go beyond

4    propaganda.  When you talk about editing and stuff, that all

5    makes me think of propaganda unless there's something I'm

6    missing so --

7          MS. WELLS:  Well --

8          THE COURT:  -- I'm interested in the material

9    support beyond propaganda.

10         MS. WELLS:  Yes, your Honor.  There were also --

11   there's plentiful information that among the things that the

12   group did, they have trouble as you can imagine pushing this

13   out into the world because the websites where you want to

14   host this kind of information if you're trying to get it out

15   there, they don't like it because it's bad.  And so what

16   would happen is there would be terms of service violations,

17   accounts get shut down.  And so the defendant himself, along

18   with other members of this group, actively sought to get

19   work-around so that they could access social media sites like

20   Twitter, like Facebook, like YouTube.  They used fake names

21   for their accounts.  But they also went to great lengths to

22   get unauthorized access, in other words, taking over

23   legitimate users' accounts so that they could use their

24   social media accounts to then push the propaganda because it

25   was able to basically slip through the filters a little more

1    easily and that information is also contained in

2    the pleading --

3         THE COURT:  All right.  Let me ask my question,

4    again.  Something that's not related to propaganda, that's

5    also propaganda related, do you have based on your

6    investigation so far -- and I know the investigation is

7    continuing -- do you have an example of a material support

8    that goes beyond propaganda either creating it or helping get

9    it up online or writing it or having people write it or doing

10   the tech support for it, do you have something in the

11   evidence you have so far that is material support beyond,

12   beyond propaganda?

13        MS. WELLS:  No, your Honor.  There's a single charge

14   in this case and that is conspiracy to provide material

15   support in connection with the defendant's membership and

16   leadership in Khattab involving all of the services and the

17   personnel that I've described.

18        THE COURT:  And all the personnel and services is

19   related to propaganda, correct?

20        MS. WELLS:  I'm only hesitating, your Honor, because

21   I think the word propaganda doesn't quite accurately describe

22   what this is because we don't necessarily agree that this is

23   sort of, I guess, mere propaganda as they're describing it.

24   These were items that were intended to recruit people.  These

25   were items that were intended to gain new members to ISIS

1    that were intended to cause people to act violently and

2    otherwise in support of ISIS --

3              THE COURT:  Well, for example --

4              MS. WELLS:  -- as a recruitment.

5              THE COURT:  Well, for example --

6              MS. WELLS:  Our view is that there's a

7    recruitment --

8              THE COURT:  Hang on a second.  Again, when I talk,

9    you have to stop talking, please.

10             Well, you know, that's a way to answer my question.

11   Judge, this is not propaganda because it's command and

12   control.  It's recruitment for personnel who are going to be

13   engaged in active operations.  It's trade craft to explain

14   how to get around security protocols or to mask your

15   identity.  I mean, those things are not related to

16   propaganda.

17             So if you have something like that, I'm just asking

18   you to underscore it for me.  Is there -- Do you have

19   non-propaganda, which is ideas rather than an offense other

20   than itself, that underscores the request with respect to

21   this case that the material support is more than words?

22   Because the argument that you just heard from counsel is that

23   he not only has a presumption of innocence but he has a First

24   Amendment right like everybody else.  And if he wants to spew

25   ideas, ugly ones or unpopular ones, he can get in line with

1    everybody else in America because that's what happens.

2          So I will need you to take on their argument head on

3    and explain to me where in the evidence I need to look to

4    find some material support beyond First Amendment or First

5    Amendment-related speech.  Go ahead.

6          MS. WELLS:  Yes, your Honor.  The charges in this

7    case are not that the defendant had bad ideas.  If he wants

8    to stand on the street corner and scream about how much he

9    loves ISIS, that is offensive and probably annoying but that

10   is not what's going on here.

11         What the defendant was, was a member of an

12   organization that took a number of sophisticated steps that

13   involved operational security, it involved protecting their

14   identities, it involved working around and violating terms of

15   service of companies, it involved gaining illegal

16   unauthorized access to accounts.  All of that was in service

17   of, among other things, spreading --

18         THE COURT:  What kind of accounts, media accounts?

19         MS. WELLS:  Twitter accounts, for example.

20         THE COURT:  Yeah, okay.

21         MS. WELLS:  Okay.  There's no version, I think,

22   where it is proper or legal to gain unauthorized access or to

23   hack into someone's account so that you can then spew forth

24   pro-ISIS information and say that that's okay.  It is the

25   government's view that that is one of the components of the

 1  material support that was provided here.  But it is worth

 2  noting that under -- we're all familiar with the *Holder*

 3  *versus Humanitarian Law Project* case.  The services involved

 4  here are not simply a group of people sitting in a closed

 5  room exchanging their ideas or even blasting them out.  It

 6  was a sophisticated operation that involved far more than the

 7  exchange of ideas.  It involves technology, software,

 8  personnel, organization, distribution, and it involved

 9  coordination with a number of different organizations

10  including, the government believes, ISIS official media

11  outlets which are designated as part of the FTO and others

12  who were part of what we would consider the official ISIS --

13  real official ISIS media.

14          And so the theory of the case encompasses all of

15  that, your Honor, but I think it goes well beyond exchange of

16  ideas.  That is not why we're here today.  I hope that I've

17  answered my question.

18          THE COURT:  Okay.  That did.  I interrupted you,

19  though, multiple times so go ahead.  Go back to wherever you

20  were in your argument.

21          MS. WELLS:  And so in conjunction with the

22  defendant's activities here, as he's providing this material

23  support to ISIS, he used his own technical expertise which is

24  very significant here because this criminal conduct took

25  place -- for better or worse the world we live in, this

1    conduct took place on the internet.  Okay.  He used his own

2    educational background.  He's got, according to his own

3    resume, a master's in computer science.  He worked as an IT

4    professional.  He is far more sophisticated than most people,

5    I gather, even in this room when it comes to technology.  He

6    maintained a separate phone, his ISIS phone.  That's the

7    white ISIS -- the white iPhone that the government describes

8    in our papers.  He had separate email accounts for this.  He

9    used multiple VPN services to conceal his IP address and his

10   location.  He gave advice to other members of the

11   organization and to the undercover officer involved in the

12   investigation as to how to mask their identities.  In

13   addition to all of that before he was ever arrested, he

14   expressed an interest in traveling back to Iraq.  He has made

15   that travel in the past.  He has close ties there.

16          And so, your Honor, in light of that sort of general

17   summary, the question for the Court today is whether there's

18   clear and convincing evidence that the defendant would be a

19   danger to the community and whether there's a preponderance

20   of evidence that he's a flight risk and the answer to both of

21   those questions is yes.

22          We have given the Court and the defense team a

23   sample, okay, a sample of the evidence to do what the

24   defendants -- mostly his history and characteristics and the

25   factors that pertain to this bond motion.  This is not a

1   summary of all of the government's trial evidence.  But this

2   binder -- you know, Mr. Durkin said a minute ago that we

3   dumped a whole bunch of stuff on them and Mr. Herman referred

4   to the parade of horribles.  I want to be really clear, this

5   is Mr. Al Safoo's parade of horribles.  The information in

6   here came from his phone, from his email accounts.  This is

7   the stuff that he has.  And so there's no way for the

8   government to force him to speak.  Obviously, we don't want

9   to do that.  That's his choice.  We can't read his mind.

10  What we can do is look at the stuff that he has and the stuff

11  that he has is unequivocal about his commitment to ISIS; and

12  not just his commitment in a theoretical sense but his action

13  to support that.  And we've outlined several examples of this

14  in our motion and it's probably worth pointing to one or two

15  just quickly here.

16          THE COURT:  As part of that highlight, why don't you

17  highlight an imminent threat rather than generalized support

18  or positive feelings for a horrible organization.  I think we

19  all agree that an imminent threat is not First Amendment

20  protected.

21          MS. WELLS:  Well, yes, your Honor.  So, for example,

22  if you look to -- one of the examples, there was a document

23  that was found on his devices or his accounts that we

24  described in our papers as like a working document that was

25  then also re-posted in the Khattab rooms and one of the

1    things that it said there was that they were creating a

2    campaign that was to involve messages of incitement to

3    continue the fight and push back and confront the Infidels.

4    And then when you take a look at some of the examples of

5    Khattab's media here, their publication is in Exhibit 13 --

6    and I can't emphasize enough, your Honor, we have not

7    included all of these.  Okay.  We've included a few.  But one

8    that's worth pointing out here --

9              THE COURT:  Well, let me just touch on that.  I

10   don't have access to all the discovery so if it's important

11   and you think it's important to my bond consideration, then

12   you got to give it to me.  So just saying that you've got

13   other stuff, that's not really helpful.

14             MS. WELLS:  I understand, your Honor.

15             THE COURT:  Okay.

16             MS. WELLS:  I make this point only to say that there

17   is a limit to how many binders I think that any of us can

18   process.  It is of the --

19             THE COURT:  And I understand that and I didn't

20   expect all the discovery but I expected the things that you

21   thought were important I needed to look at for the purposes

22   of bond you have in front of me so that's what I'm going to

23   proceed on.

24             MS. WELLS:  One example here is in Exhibit 13, it's

25   this image.  There's a helicopter and a soldier.  It's got

1  the Khattab logo on it.  State of the Caliphate, Islamic
2  state, the future will be bitter and worse.  We will water
3  the earth with your blood.  Prepare your coffins and dig your
4  graves.
5        A similar example, your Honor, if you look, there's
6  an image here of Osama Bin Laden.  There's an airplane that
7  says Do Not Forget 11 September.  This is also in Government
8  Exhibit 13.  "We have by Allah's grece made you forget the
9  horrors of the Washington and New York attacks, and today we
10  remind you of it and promise you terror which will make you
11  forget the most precious that you have."  There are
12  similar -- a threat to the World Cup, which will not -- this
13  is the image of the Russia 2018 World Cup with a Jihadi
14  soldier.  World Cup 2018, we will not exclude anyone from
15  you.  There's another one, celebrating the Las Vegas attack.
16  There are examples that we cited in the complaint that are
17  similar, your Honor.  So these things are -- they're directly
18  threatening violence.
19        THE COURT:  Is a celebration of past violence, do
20  you consider that to be an imminent threat?
21        MS. WELLS:  I guess there could be -- I guess
22  there's two different categories there.  A celebration of
23  past violence may not in and of itself be an imminent threat.
24  I do believe --
25        THE COURT:  Well, it's not, isn't it?  I mean, if --

1          MS. WELLS:  No.  I believe that it's a recruitment
2    tool.  I think that --
3          THE COURT:  Okay.  But it's not an imminent threat.
4    It's something but it's not an imminent threat.  If I just
5    say, well, I thought what happened in Vegas was great.  I
6    mean, that's not an imminent threat.  That's something else,
7    right?
8          MS. WELLS:  Regardless of that, I think there's at
9    least two categories here.  There's things that celebrate
10   past acts of violence and things that threaten future acts of
11   violence, the first example that I showed you, that we will
12   water the earth with your blood example.
13         THE COURT:  Okay.  That sounds like a future
14   comment --
15         MS. WELLS:  Exactly, your Honor.
16         THE COURT:  -- but the other one doesn't, right?  I
17   mean, right?  If it's a past -- if it's celebrating past
18   violence, that's not an imminent threat.
19         MS. WELLS:  The Las Vegas attack.  But, for example,
20   the World Cup poster, this was as I recall released in and
21   around the time of that event so we're looking at it in the
22   past now but you have to put this in the context of when it
23   was first published.  And the same thing with the Las Vegas
24   attack, my understanding is that stuff was released shortly
25   after.  So we're talking about it now in late 2019 but these

1    things came out at a far different period in time and so I
2    think that context matters.

3          THE COURT:  Okay.

4          MS. WELLS:  And I think these repeated references to
5    September 11, often these campaigns take place around the
6    anniversary of that.  Again, that is meant to incite,
7    recruit, and convince folks to do like -- to do similar
8    activities in the future.

9          We've talked a little bit about the operational
10   security measures that the defendant took.  He kept his own
11   separate ISIS phone.  He had separate email accounts.  One of
12   them, as we note in our motion, was his James Foley email
13   account.  That was the title.  That was a James Foley
14   followed by a series of numbers at Gmail.  That obviously is
15   named for the famously murdered American journalist by ISIS.
16   He also provided advice to other members of Khattab and the
17   OCE on how to hide their identities and he discussed
18   various -- with various people his plans or desire to return
19   to Iraq.

20         And so I think that that -- that body of evidence,
21   your Honor, as we've presented here as outlined in the
22   complaint and as previously discussed with Judge Weisman is
23   enough to meet the government's burden and I want to address
24   some of the specific points the defense made.

25         One, Mr. Durkin made a lengthy argument about what

1   happens in terrorism cases and the war on terror and he

2   appears -- his argument, I think, was too many terrorism

3   defendants are not released pretrial.  The defense team may

4   not like the law but the law here is really clear and the

5   Court has clear guidance.  The 3142 factors apply.  We're in

6   2339(b) land.  It's a material support case.  There is a

7   presumption.  That's the law.  And it's a rebuttable

8   presumption but we have clear guide posts to follow and

9   there's no need for us to look beyond this case or this

10  defendant in making a determination about detention.

11          THE COURT:  The statutory provision is pretty clear

12  and there's similar rebuttable presumptions in drug cases and

13  other types of cases.  I think what counsel was saying is

14  that it's not just that Congress has given the Court a

15  rebuttable presumption, which is obviously legal, he's just

16  saying the implementation of that within the context of a

17  particular triggering presumption just doesn't seem to be

18  consistent or been treated in the same way that the other

19  presumption cases are.

20          MS. WELLS:  Your Honor --

21          THE COURT:  People are overcoming in presumptions in

22  drug cases and other cases and yet he's just sort of

23  underscoring the counterpoint which is the presumption of

24  innocence which is of a constitutional dimension, and the

25  rebuttable presumption regarding flight or danger to the

1    community obviously is a statutory one so I think that's what

2    he was saying.

3            MS. WELLS:  And that may be the case, your Honor,

4    but it remains the fact that what we have to look to today is

5    the facts surrounding this particular defendant and that is

6    all the government is arguing is that the information related

7    to his conduct to the information that he possessed to the

8    steps that he took show that he's a danger to the community

9    and show that he is a risk of flight.

10           THE COURT:  Well, I agree with that a hundred

11   percent.  I can't set bond in all terrorism cases and I'm not

12   inclined to try.  I have to set bond in this case or not.

13   That's what I have to do.  I agree with that.  Go ahead.

14           MS. WELLS:  As to questions about this -- what they

15   have proposed, you know, the online monitoring question, we

16   did check with both Pretrial and Probation on this and it is

17   our understanding that whatever online monitoring system

18   Probation has it is simply not available to --

19           THE COURT:  What's simple about that?  How is it not

20   available --

21           MS. WELLS:  Your Honor --

22           THE COURT:  -- because that sounds like a

23   bureaucratic response to the Department of Motor Vehicles to

24   me.  If they can use it for other things, why can't I order

25   it?

1          MS. WELLS:  Your Honor, I don't know whether -- if

2     you issued that order today whether it could be honored or

3     not.  I am not a member of the Probation Department.  I will

4     say this, though, because I think this goes to sort of the

5     heart of this issue here.  There is, however, a difference

6     between pretrial release and supervised release when that

7     probation system would kick in --

8          THE COURT:  Yeah, one person has got a presumption

9     of innocence and the other one doesn't.

10          MS. WELLS:  That's -- that is exactly right.  We

11     certainly agree with that, your Honor.  But another issue is

12     that whatever resources are available to Pretrial to someone

13     who is presumed innocent and the probation monitoring

14     systems, someone who is on probation or supervised release

15     has already gone through this whole process.  They've already

16     been convicted of some crime and the sentencing judge in that

17     case has been able to weigh whatever that judge needs to do

18     to determine whether a term of incarceration is necessary, to

19     determine whether the defendant remains a risk to the public

20     and whether the public needs to be protected from future

21     crimes of the defendant, whether there's a need to

22     specifically deter that defendant from that conduct and so

23     all of those things will have already been weighed.

24          Here what we have is someone where there is, the

25     government's position, a significant amount of evidence

1    showing that he is interested, has done and would likely

2    continue to do -- take a number of actions on behalf of ISIS

3    to advocate violence, to attempt to recruit new members and

4    he would be able to do it in a way that is very, very

5    difficult if not impossible to monitor.  I am not sure --

6         THE COURT:  Hang on a second.  That's an argument to

7    say that the technology wouldn't be successful.  It doesn't

8    answer my question that I'm just getting a blanket response,

9    it's not available.  Why, because.  That doesn't make any

10   sense to me.

11        MS. WELLS:  Your Honor, I would have to defer --

12        THE COURT:  Hang on a second.  Can you shed any

13   light on why a pretrial detainee can't take advantage of a

14   technology that the government is in possession of and has

15   the ability to implement in other instances?

16        MS. MULRY:  Your Honor, I don't know why we don't

17   have that resource available to us.  I do know that Pretrial

18   Services is a separate department to Probation so at this

19   point we do not have a computer-monitoring program available

20   to us.  We don't have officers that monitor computer programs

21   whatsoever.  Certain districts do with Pretrial Services but

22   at this point our district we do not; and I cannot speak to

23   why other than budgetary constraints and lack of resources.

24   Other than that, I really don't know why we don't have that.

25        THE COURT:  All right.  I totally put you on the

1  spot so I appreciate your candor.  Thanks so much.  Okay.  Go

2  ahead, counsel.

3       MS. WELLS:  The other thing with regards to any

4  online monitoring program is it can only apply to devices

5  that have been identified.  And in this case, all it takes is

6  any internet-enabled device that doesn't have that software

7  attached to it that someone doesn't know about that then any

8  of this monitoring is sort of all for nothing.

9       And so to that point, it is not clear that there are

10 any conditions of release here that would be able to prevent

11 the defendant from continuing with this conduct.  It is a

12 fact that this crime took place using sophisticated means on

13 the internet and that means that that is the world that we're

14 living in.  We have to look at those facts and whether there

15 are conditions of release that can account for that and there

16 are none that have been proposed, your Honor.

17      I want to touch a little bit on some of the

18 discovery issues that were raised and the counsel of choice

19 issues that were raised.  Mr. Durkin said that the

20 government's proposed solution here is not to modify the

21 order, meaning the protective order.  For one thing, if the

22 defense team is having difficulties with discovery, we first

23 want to emphasize that the government has been and remains

24 very willing to work out solutions that accommodate the needs

25 of this case and we agree that it has some unusual factors,

1  but the remedy that they're seeking is not a modification of

2  the protective order which they would be perfectly able to

3  present to your Honor.  What they're asking for is release on

4  bond.  And again, the factors under the law don't -- they

5  simply don't include access to discovery.  If they want to

6  seek relief from the protective order, they can and should do

7  that.  If they want to work with the government to get better

8  access and come up with solutions, we want to work with them

9  and make that possible.

10          THE COURT:  What improvements in the discovery

11  process are you proposing?

12          MS. WELLS:  Your Honor, we have -- there's two

13  different problems with the discovery process as I understand

14  it from defense counsel.  One is that as a matter of BOP's

15  policy, certain types of media cannot be brought into the

16  jail.  That has nothing to do with the government.

17          THE COURT:  Well, BOP is part of the government.

18          MS. WELLS:  Well, I can't order them to do much.  We

19  can try, though, and we have been willing to work on this but

20  things -- it's a matter of the type of media.  I think

21  Blu-ray discs can't be brought in and things -- sort of

22  larger capacity devices can't be brought in.  We have tried

23  to take things off of those types of devices and put them on

24  CDs so that that can be brought in and we've done that in a

25  number of places and with the most critical evidence,

1    particularly the back and forth communications between all of

2    the members in the Khattab organization, and we went to great

3    lengths to redact out anything that would be inciting to

4    violence or similar so that they could bring that in and

5    leave it with the defendant and that is really the bulk of

6    the evidence.

7          And so we have, I think, at every turn tried to

8    identify opportunities to do things like that.  We remain

9    willing to do so.  And so in any event, though, none of that

10   is 3142 factors.

11         THE COURT:  Well, if you're willing to do so, go

12   ahead and take your ideas and put them into action.  Don't

13   wait for defense counsel to make a request and to express

14   difficulty because they've done that already.  And it -- he's

15   got a right to counsel, he's got a right to an attorney that

16   is able to discuss the evidence with him.  Obviously, we're

17   not talking about the classified stuff.  We're talking about

18   a different category.  And a bureaucratic response from the

19   Bureau of Prisons that we can't do that, that becomes your

20   problem also and it's up to you guys to fix the problems with

21   discovery because the failures of discovery will fall upon

22   the government; not upon the defense.  And if -- for example,

23   I know people get writted out for proffers all the time.  If

24   you need to use your resources to get him out, in custody

25   obviously, in a situation where he's able to review discovery

1    and defense counsel doesn't need to babysit him but there's a

2    secure environment for doing that, if that's the resource you

3    need to expend to properly prosecute the case, then you need

4    to actively be engaged in that process because if we get to a

5    point where we can't set a reasonable trial date and counsel

6    is telling me I didn't get a chance to go through this proper

7    discovery or we get an issue -- or even worse, we get an

8    issue at trial after double jeopardy is attached, I'm not

9    going to hear arguments well they didn't ask us because they

10   did.  So totally above and beyond any issue of bond, the

11   discovery issue is something you guys need to actively work

12   on.

13          MS. WELLS:  Your Honor, I think we would be more

14   than happy to have him brought over if that's a solution that

15   defense counsel would -- we're happy to talk with them and

16   make that happen if that would move things forward.

17          THE COURT:  All right.  I'm ordering you to talk

18   about those issues.  I don't want to hear about him not being

19   able to prepare his case.  I don't want to hear that.  I want

20   to hear from him, Judge, discovery is going along perfectly,

21   I'm going to be ready for trial and we're going to have a

22   nice fair trial consistent with the Constitution.  That's

23   what I want to hear in a status, not that I might need bond

24   because I can't get my guy to look at this stuff.  All right.

25   Okay.  Go ahead.  I interrupted you again.

1          MS. WELLS:  Yes, your Honor.  A few other -- just to

2    sort of circle back on some of the points that Mr. Herman

3    made specifically about the evidence, you know, we mentioned

4    the -- pointing to Exhibit 12T, this is one of the

5    translations, again I just wanted to give you a citation.

6    This is for the document that called for messages of

7    incitement to continue fighting, information to obey and

8    denounce disobedience of Emirs and specifically sending

9    letters of intimidation and threat to the enemies of the

10   Islamic State and to say that the State is going to implement

11   its promise to root out the groups of faithlessness and

12   apostasy.  This came from the defendant's accounts and

13   devices.  The same statement in nearly identical form was

14   then posted in the Khattab rooms by another member of that

15   organization.

16          And so when you're asking questions about are there

17   threats of violence, is that what this organization is about,

18   yes.  This was the design for a campaign where they very

19   specifically talked about that as a goal.  And so regardless

20   of whether or not Mr. Al Safoo, in addition to all of this,

21   wrote some articles, he did that too, but that's not what the

22   limit of the case is about.

23          Similarly, if you take a look at Exhibit 16, this is

24   one of those magazines that he kept and this is -- 16

25   specifically is called Al-Naba, which is another pro-ISIS

1  magazine.  The last page of that is one of the translations

2  that we provided.  And this is the tips for the Mujahidin,

3  which also talks about particular threats to people who

4  disagree with ISIS.

5          Turning back to Exhibit 13, there are some other

6  examples that we didn't pull up a moment ago.  There's other

7  September 11th graphics there, including one that says:  Oh,

8  America, you won't live in peace unless we see it happening

9  in Palestine.  Or we end where Ham -- and then there's the

10  name of another person, has ended.  Similarly, there's

11  another September 11th graphic:  By the grace of allah and

12  his power, we glorify your streets, demoralized by impurity

13  -- your impure blood on your feast days, oh slaves of the

14  cross remember, hash tag, Manhattan battle, again showing the

15  buildings burning.  Another September 11th graphic showing a

16  Jihadi fighter, a Caliphate fighter.  There's a burning

17  American flag.  "O, Crusaders, Allah has enabled us to pluck

18  your heads in Niger.  Soon we will do the same in the streets

19  of New York and London."  And this one is important, your

20  Honor, because that reference to Niger, this was really

21  shortly after I believe four American soldiers --

22          OFFICIAL COURT REPORTER:  I'm sorry.  Please slow

23  down.

24          MS. WELLS:  Yeah, I'm sorry.  This was really

25  shortly after --

```
1             THE COURT:  All right, yeah.  I was about to say
2   something myself.  You're over 300 words a minute.  Don't
3   worry.  You have all the time you need.
4             OFFICIAL COURT REPORTER:   440.
5             THE COURT:  440.  Oh, my God.  That's a new record.
6   All right.  Slow down, counsel.
7             MS. WELLS:  Yell at me if I'm talking too fast.
8             MR. JONAS:  Your Honor, I have to catch a flight.
9   Is it okay if I leave?
10            THE COURT:  Yes, you may.
11            MR. JONAS:  Thank you, your Honor.
12            MS. WELLS:  This reference to plucking -- enabled us
13  to pluck your heads to Niger -- this, I believe, took place
14  shortly after -- I think it was four American soldiers were
15  killed by ISIS fighters in the country of Niger.  And so,
16  again, there are a number of different examples.  We cited
17  some videos --
18            THE COURT:  Counsel, please down just a little bit,
19  just a little bit.  Thank you so much.
20            MS. WELLS:  We cited a few videos in our papers as
21  well.  Two of them were Khattab-specific videos and then
22  another one was featuring Abu Australi, who is an ISIS
23  fighter from Australia.  And in that video, he is
24  specifically calling on people again to commit those acts of
25  violence, to commit lone wolf attacks, martyrdom attacks.
```

1    The Khattab videos celebrated similar acts and glorified

2    ISIS' military successes.  Again, these are all recruitment

3    materials.  The purpose of this information, the purpose of

4    all of this is to bring people over to the cause and frankly

5    to instill fear in everyone that they perceive to be their

6    enemy.

7              And so the nature of this information is very -- it

8    makes very clear what he believes but also what he was doing.

9    He joined this organization.  He was a leader of this

10   organization.  And what they were committed to was helping

11   ISIS in every way that they could including media Jihad

12   which, to be clear, was something that ISIS and ISIS'

13   official media arms called for.  They issued an order to

14   their supporters to engage in media Jihad.  It is considered

15   by them to be an imperative and necessary form of support and

16   that is exactly what the defendant was doing.  He followed

17   that order and he did it on an extremely committed basis over

18   a very lengthy period of time.

19             THE COURT:  Can you address the current state of

20   discovery?  How much more discovery do you anticipate?  And

21   also with respect to the superseding indictment that you also

22   talked about, do you have any updates for the Court regarding

23   timing of either of those?

24             MS. WELLS:  Discovery is essentially completed.  As

25   the Court well knows, there have been additional examples of

1  legal process that continue to be issued so as that

2  continues, we'll obviously continue to turn things over but

3  virtually -- discovery is complete.

4         THE COURT:  Okay.  What about the superseding

5  indictment?

6         MS. WELLS:  We anticipate one in the next couple of

7  months.  I realize it's been a long slog but --

8         THE COURT:  Okay.  Do you need to respond to any of

9  that, counsel?  Anything?

10         MR. DURKIN:  With what you just said or --

11         THE COURT:  Or anything.  Anything you want.

12         MR. DURKIN:  Well, first of all, I think you

13  articulated my argument better than I did so I'm going to

14  quit while I'm ahead on that.  But you asked the right

15  questions and it took them a long time to get around to

16  answering no.  There's nothing other than advocacy and there

17  is nothing whatsoever that he did.  He didn't write -- the

18  one she was going through, these parade of horribles with

19  September 11th, those are the ones I mentioned to you.  He

20  didn't write those.  Those are all part of some other thing

21  that was downloaded.  He -- There's nothing they can point to

22  that he wrote.

23         And secondly, what they continue to refuse to

24  acknowledge is that -- they're treating Khattab as if it's

25  the official arm of ISIS or it's its own SDTO.  Khattab isn't

1   a specially designated terrorist organization so where do

2   they get off saying that just because he was helping them,

3   that's material support to a terrorist organization?  They've

4   got a lot of links before they get to Khattab, which is about

5   the only thing that they've argued they can prove which is

6   somehow he helped Khattab, which is not a terrorist

7   organization.

8           And to suggest that somehow he -- that Mr. Al Safoo

9   somehow answered some call by ISIS is wishful thinking and

10  insane.  There's no such evidence and they're not going to be

11  able to point to that.  Yes, does he obviously believe in

12  some of the things that ISIS believes in?  Yes.  That's First

13  Amendment protected.  That's why he has viable defenses.

14  That's why the whole argument that somehow they have this

15  parade of horribles to make him dangerous is so off base in

16  this case and you asked the right question there.  Yes, this

17  is the only case you have to decide and this case deserves

18  bond because we have shown you that there are reasonable

19  conditions.

20          And this argument -- this First Amendment argument

21  that they acknowledge, first of all, it's nice of them to

22  acknowledge that but with all due respect, the First

23  Amendment is expanded beyond street corners today.  In the

24  year 2018, we're talking about -- or 2019, the First

25  Amendment, you know.  The only place you can espouse your

1  ideas is just not on a soapbox on the street corner like at

2  the turn of the century.  We're in a new world.  That's First

3  Amendment activity or at least it's a reasonably good defense

4  to this charge which normally you don't have in these cases,

5  which is one of the reasons I put it in perspective of other

6  cases.

7          But, you know, the government -- at the end I wrote

8  this down.  She says it's not clear that there are

9  conditions.  Well, it is clear that there are conditions and

10  those conditions are reasonable.  I would submit on behalf of

11  Pretrial Services that perhaps one of the reasons that there

12  is a bureaucratic difference in terms of what remedies are

13  available for post-conviction and pre-conviction is that

14  Pretrial Services still believes in bond and perhaps it was

15  the decision of the administrative officials who give out

16  money and say what programs are available to whom is perhaps

17  because they don't need to have that many things available

18  because bond is the alternative that remedies that.  But to

19  somehow say that because we don't have the service available

20  even though our department or our agency has it is certainly

21  not something that this Court could tolerate

22  constitutionally.

23          I don't -- I think that this detention order is

24  unconstitutional and I think in cases where it's this clear

25  that there are conditions that are reasonable, maybe not a

1    hundred percent certain, but reasonable, then I say this is

2    an unconstitutional order and I think he should be released.

3         THE COURT:  One of the, obviously, arguments he's

4    making is that you're pointing to threats but he's in

5    possession of those threats rather than making the threat.

6    Is there any -- and you cited several ones that, you know,

7    sound like imminent threats.  Do you -- are any of those in

8    particular any one you want to point out for me as something

9    that he communicated to another person rather than just

10   download or otherwise possess?

11        MS. WELLS:  Your Honor, if you go through -- this is

12   in the complaint and generally in the Khattab room

13   discussions, the way that the organization worked -- this is

14   just by way of explaining how they operated -- there are

15   different sections that would create and have different

16   roles, some designed graphics, some proofread, some wrote,

17   some did the video editing, some did audio editing, et

18   cetera.  Among the things that would happen is when something

19   was prepared and finalized and got the go ahead from the

20   group, it would be like okay disseminate and then there would

21   be a long list of links, sort of live links where people

22   could then go out to those places, grab the content and then

23   redistribute it.  The defendant participated in that kind of

24   activity, okay, and so there are a number of examples of that

25   throughout the discovery.

1        We also pointed out that one of the things that he
2   had on the notes application of his phone was a list of like
3   Twitter accounts and log-ins that were using a method that
4   was shared within the Khattab group to gain unauthorized
5   access to other users' accounts.  He had those lists of
6   accounts that he had the user name, the updated password
7   information reflecting his gaining unauthorized illegal
8   access to those accounts and then he had notes about
9   different pro-ISIS related content that, in some of those
10  instances, went out.
11        And so, yes, there is evidence in this case that he
12  was disseminating this kind of information and that he was
13  participating in the process and it is a conspiracy case
14  which is something defense counsel, I think, ignores.  If you
15  look through the conversations that he's having in these
16  rooms, he's listed as an administrator in many of those
17  conversations, meaning he had rights and privileges in those
18  rooms that other users did not, and he was well aware of all
19  of the conduct of the organization, he participated in it,
20  and what his particular role if he was -- you know, primarily
21  one of the writers and he was the head of the writers' group,
22  that does not mean that he did not otherwise participate and
23  certainly that he was -- he was aware of the scope of the
24  conspiracy, participated in it.
25        And when you look at some of the comments that he's

1   made -- and I'll direct the Court to Page 12 of the

2   government's filing -- you know, he talks about what he wants

3   the group to do.  He wrote in one instance -- and this is in

4   Government Exhibit 17 at Bates number ending 0036 -- the

5   Islamic State mobilized us to migrate but we did not migrate

6   and they are mobilizing us for media support.  He is talking

7   about ISIS instructing him and the organization to engage in

8   media support and they are answering that call and it is

9   not -- it is not the case -- Mr. Durkin, I think, is

10  misconstruing things.  We're not saying that he provided

11  support to Khattab which then -- he and Khattab, the

12  organization, provided material support.  That's the case.

13  He's the member of a larger organization.  It's a conspiracy.

14  It's essentially a company, a business, an enterprise that

15  was in the business of providing material support to ISIS and

16  he made his goals clear over and over again.  When he says

17  they are mobilizing us for media support, he asks:  So should

18  we sit idle again.  That's obviously a rhetorical question.

19  And the answer from his point of view is no.

20          He also wrote, and this is the same page:  It is a

21  shame for a Mujahidin supporter to sit idle.  No Jihad and no

22  support.  So he is kind of lamenting inaction by people

23  committing Jihad on behalf of ISIS.

24          In terms of -- at some point earlier today, someone

25  made the point that he had never pledged allegiance to ISIS.

1   To be clear, I don't think that pledging Bay'ah is a
2   requirement for a material support charge.  However, there is
3   ample evidence here that the defendant, that his organization
4   and that his co-conspirators did make that oath of
5   allegiance.  And I'll direct the Court to Government Exhibit
6   18.  This contains a collection of at least three different
7   forms of the renewal of Bay'ah.  This was again a push by
8   ISIS supporting groups worldwide to renew, meaning they've
9   done it once already at least, to renew that oath of
10  allegiance.  He had a collection of them on his accounts and
11  devices.  His organization, as we describe in the complaint
12  and our papers, made that same pledge and renewed that same
13  pledge.  And there are ample examples where he spoke out in
14  favor of Abu Bakr al-Baghdadi, who is the leader of ISIS.
15  That is also referenced in Page 12 of the government's
16  papers.  And particularly one example is Government Exhibit
17  19 at one.  And there he criticized someone who referred to
18  Baghdadi without the title of Shaykh, Caliph or Emir; and
19  then went on to say some disparaging things about someone
20  that would talk about ISIS' leader in that capacity.
21          So when we talk about is this organization dedicated
22  to ISIS, yes.  Is it taking steps to provide material support
23  to ISIS, yes.  Is part of that following ISIS' explicit
24  instruction to engage in media Jihad, yes.  Did they do that
25  by gaining unauthorized access to accounts, yes.

1           THE COURT:  All right.  Anything further, counsel?

2           MR. DURKIN:  Just this:  You can't conspire to do

3   something the First Amendment says you can do.  It's as

4   simple as that and that's what this case is about and there's

5   a legitimate factual issue in this case based on everything

6   you've heard, everything else you've read.  This man has a

7   viable defense and there are conditions that will reasonably

8   assure the safety of the community and whether he's going to

9   flee.  That's the issue.

10          And to make these co-conspiratorial corporate leaps

11  that they're making is exactly what I said before is what's

12  unconstitutional about this order in this particular case.

13  It's -- you have to go -- you got to jump through a lot of

14  hoops to get to where they want you to get to and I don't

15  think that -- I think you can see through that.

16          This is a -- he has a viable defense and there are

17  conditions reasonable -- that can reasonably assure, that you

18  could be reasonably assured that he's not a danger -- that

19  the community is not in danger of his conduct, whatever that

20  might be, which is I guess another whole issue too as to, you

21  know, what is it that he could do?  And I did want to say

22  this not to be a smart aleck but I'll be a smart aleck --

23          THE COURT:  Can you help yourself?

24          MR. DURKIN:  No.

25          THE COURT:  I didn't think so.

1    MR. DURKIN:  I can't.  You know that.  Their

2  argument would mandate that he be put in the SHU, you know,

3  segregated housing, with SAMS.  That what their argument --

4  the logical conclusion of their argument is because he's in

5  the general population now and it's my understanding that

6  it's not too complicated to get access to a cell phone in the

7  MCC and he's been there for quite some time.

8    So if he really was this zealot who was going to try

9  to just do whatever he could do to get the word out and that

10  was his mission in life which was sending the word out on

11  this internet Jihad which I've never heard of before -- and

12  that's a term that's so misused as well.  You know from just

13  general reading that's laughable.  But the logical conclusion

14  of their argument is that he needs to be put in the SHU with

15  SAMS because there's no other way to guarantee that he can't

16  spread this word and that's what they're asking for.  That's

17  what I've said from the beginning.  They're looking for a

18  guarantee.

19    Magistrate Weisman, with all due respect -- and he's

20  my friend -- I think he was looking for a guarantee and you

21  -- and when you put a guarantee on instead of reasonable,

22  then we're violating the Constitution and God knows we're in

23  need of that today.

24    MS. WELLS:  Your Honor, if I could very briefly.

25    THE COURT:  Yeah, sure.

1    MS. WELLS:  I want to be really clear, this is not

2 about taking anyone's argument to its logical conclusion.  We

3 are not asking that he be put in the SHU.  We are not asking

4 that he be subject to SAMS restrictions.  We are simply

5 saying that there is ample evidence to show that he's a

6 danger to the community.  There's ample evidence that he's a

7 flight risk.  Again, we haven't spent a lot of time on flight

8 today but his technical sophistication, his ties to Iraq, his

9 previous travel and his statements to the effect that he

10 would like to return there paired with the fact that he's

11 facing right now a max -- a statutory maximum of 20 years

12 imprisonment if convicted, there is every incentive in the

13 world for him to flee.

14    And so again, Mr. Durkin I think keeps trying to

15 expand this into territory that we're not in.  The only

16 question for the Court today is whether this defendant who

17 possessed this information is a flight risk or a danger to

18 the community and the answer is yes.

19    MR. DURKIN:  To end on just a government trope as

20 they always do, it's a burden every day that drug dealers and

21 people in serious drug cases meet every day.

22    THE COURT:  Okay.

23    MR. DURKIN:  Thank you.

24    THE COURT:  I'm going to take 109 under advisement.

25 I did not complete my review of the large binder.  I tried to

1  but I did not get it done in light of other cases I had in
2  front of me so I'm going to take it under advisement and I'll
3  issue a written order as quick as I possibly can.

4          I'm going to require in ten days that the government
5  submit a report explaining to me how you are going to solve
6  the problems with the review of the non-classified discovery.
7  I'm putting the burden on you guys --

8          MS. WELLS:  Yes, your Honor.

9          THE COURT:  -- because I don't want this to be a
10 problem in the case.  So telling me that you're willing to
11 talk to them, I appreciate the willingness, but I don't want
12 that to be the case because you're the ones who can make the
13 difference.  Defense counsel can complain but beyond that he
14 doesn't really have a lot of power to do anything other than
15 complain to you, complain to the Bureau of Prisons and then
16 eventually complain to me.  I don't want him complaining to
17 me.  I want him happy about his discovery and his trial
18 preparation.

19         So give me a ten-day -- just go ahead and file it;
20 and if you have to file it under seal, you have permission to
21 do so.  I don't know that you would need to but I want a
22 procedure going forward.  And if the Bureau of Prisons has a
23 reason for security reasons they can't do something, then I
24 need creativity and resources on behalf of the U.S.
25 Attorney's Office to figure out how to solve the problem

1    because what you don't want is me to micro manage it because

2    then it becomes more difficult for the parties than if

3    they're able to work something out on their own.  And I know

4    you've got a lot of other things to do.  You're preparing a

5    superseding indictment and all those other things but I want

6    to put that on the top of your pile if I can so go

7    ahead and -- Gloria, give me the ten-day date for that

8    report.

9            MS. WELLS:  Yes, your Honor.  And I want to add,

10   we --

11           THE COURT:  Hang on a second.  Let me get the date

12   first.

13           COURTROOM DEPUTY:  October 7th.

14           THE COURT:  Okay.  Go ahead, counsel.

15           MS. WELLS:  Just that we take this issue seriously

16   and we hear the Court and we're going to come up with some

17   good solutions or do the best we can and we'll get that to

18   you.

19           THE COURT:  All right.  Excellent.  How long should

20   I set the case over?

21           MS. WELLS:  Your Honor, I think last time we were

22   here, the government suggested that we go ahead and set a

23   trial date for the late spring and defense counsel, I think,

24   had some -- wanted to defer that decision until today.

25           THE COURT:  Do you want to make a trial decision in

1    terms of date?

2            MR. DURKIN:  Well, I mean, I could try this case,

3    you know, but I -- relatively earlier, you know, but I'm not

4    sure what this superseding indictment is all about.

5            MS. WELLS:  Well, we've made clear we've turned over

6    all of the discovery relevant to that --

7            THE COURT:  Yeah, but he doesn't know --

8            MR. DURKIN:  But I don't --

9            THE COURT:  Hang on a second.  He doesn't know what

10   the superseding indictment is.  That's kind of a critical

11   thing in preparation of a trial.  So when is the superseding

12   coming out because I'd love to set a status right after that.

13   He can look at the superseding and go I'm going to be ready

14   for trial on X and then we all look at everyone's busy

15   calendars, we plug in a date.

16           MS. WELLS:  I think we can set that for late

17   November.

18           THE COURT:  November?

19           MS. WELLS:  End of the --

20           THE COURT:  End of November.  Are the parties

21   available the first week of December?

22           MS. WELLS:  That's fine for the government.

23           MR. DURKIN:  We have a case that starts in

24   Washington.  It starts on the 4th, Judge, but it's -- there's

25   a very strong chance that it won't go.  If you want to set

1  this for, say, Monday the 2nd, it's possible that -- that I

2  know we could make.  If we could do the afternoon of the 2nd,

3  that would work.

4         THE COURT:  What about that 3rd?  Usually Mondays

5  I'm picking juries so those days are all eaten up but

6  Tuesdays I have availability.  You can appear by phone if you

7  need to.

8         MR. DURKIN:  That's fine.  All right.  That works.

9         THE COURT:  All right.  Gloria, what's that Tuesday

10  look like?  Can we fit them in?

11         COURTROOM DEPUTY:  Tuesday, December 3rd at 1:00

12  p.m.

13         MR. DURKIN:  That will be great.

14         MS. WELLS:  That's good for the government.  Thank,

15  you, your Honor.

16         THE COURT:  All right.  Is there a motion to exclude

17  time?

18         MS. WELLS:  Yes, your Honor.

19         THE COURT:  Any objection?

20         MR. DURKIN:  We take no position.

21         THE COURT:  All right.  Oral motion to exclude time

22  is granted.  The Court finds the ends of justice are served

23  by the continuance and outweigh the interests of the public

24  and the defense in a speedy trial based upon a reasonable

25  time necessary for effective preparation by counsel taking

1   into account the exercise of due diligence.

2          In the interest of justice, time is excluded from

3   today's date through and including December 3rd for the

4   review of discovery, trial preparation and the completion of

5   the defendant's pending motion.

6          Anything else, counsel?

7          MS. WELLS:  Not from the government.  Thank you.

8          THE COURT:  Anything else, counsel?

9          MR. DURKIN:  No, Judge.

10         THE COURT:  All right.  Thank you.  See everyone.

11         MR. DURKIN:  Thank you.

12         MS. WELLS:  Have a good day, your Honor.

13         THE COURT:  Have a good day.

14     (Which concluded the proceedings in the above-entitled

15  matter.)

16                C E R T I F I C A T E

17         I hereby certify that the foregoing is a transcript

18  of proceedings before the Honorable John Robert Blakey on

19  September 26, 2019.

20

21  */s/Laura LaCien*

22  _____        November 22, 2019
    Laura LaCien                                Date
    Official Court Reporter

23

24

25