UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

ASHRAF AL SAFOO,
  also known as "Abu Al-Abbas
  Al-Iraqi," "Abu Shanab," and
  "Abussi"

No. 18 CR 696

Judge John Robert Blakey

## **GOVERNMENT'S SENTENCING MEMORANDUM**

Defendant Ashraf al Safoo managed an online media outlet, Khattab Media Foundation, dedicated to producing and publishing propaganda for the Islamic State of Iraq and Syria. He promoted, encouraged, and celebrated the slaughtering of Westerners, and he even hacked Twitter accounts to push violent, graphic propaganda further. The design was twofold: terrify the Islamic State's enemies and radicalize others into joining and supporting the terrorist group—to travel and fight for ISIS in the Middle East, commit lone-wolf attacks in the West, and, to encourage more of both, spread the Islamic State's propaganda online, as defendant did.

Defendant is, almost certainly, irrevocably radicalized. He agreed to swear an oath, or the Bayat, to the Islamic State's caliph in secret (GX402-12T); his foundation, Khattab, called upon others to do the same (GX1113-6; GX285A-T); he has repeatedly promoted heinous crimes (*e.g.*, GX313, GX 418; GX233); he actively "[p]articipate[d] in the war, spread terror, … and incite[d] others," as he put it (GX284); and he called for the West's demise and the growth of a vicious caliphate (*e.g.*, GX217). In light of defendant's crime, his character, and his dangerousness, the government respectfully

submits that a 40-year term of imprisonment and a lifetime of supervised release is sufficient but not greater than necessary to account for the factors set forth in 18 U.S.C. § 3553(a).

## I.    OFFENSE CONDUCT

Defendant's offense is set forth at length in the Presentence Investigation Report and the Court's posttrial findings of fact and conclusions of law (R. 425 ("Findings of Fact")). In summary, between 2017 and 2018, defendant, under the pseudonyms "Abu Abbas Al Iraqi," "Abussi," and "Abu Shanab," worked for and helped manage Khattab Media Foundation, an online media outlet, operating principally on Telegram, which "existed exclusively to serve ISIS's media needs and directions." *Id.* at 53. As the Court explained:

> The overwhelming evidence presented at trial showed this conspiracy was ongoing, coordinated, and highly structured. Khattab had dozens of members, as shown in the Telegram groups in the Government's 100 and 200 exhibit series. The organization had its own logo, which was often interchanged with or attached to the ISIS flag in its infographics, articles, and videos. And Khattab had an organized structure, as confirmed by the testimony of Mothafar and as seen in the Telegram groups. The organization divided itself into specialized subgroups, including a writer's group, graphic design group, and others. … [And t]he evidence demonstrated that Khattab's internal organization and activities were part of a cohesive, recognized structure of unofficial media foundations actively supporting ISIS and working under its direction.

*Id.* at 52. Defendant began as a writer for Khattab, authoring pieces promoting ISIS's extremist views on religion and the Middle East. By 2018, he was a manager of Khattab's "Writer's Group"—the arm of Khattab charged with writing articles to support ISIS's practical and ideological goals. Defendant supervised Khattab members via a Telegram group where, for example, defendant instructed Khattab

members responsible for drafting media on suitable topics, edited their work, and coordinated the articles' release with other Khattab sections, including graphic designs and videos, to maximize effect. The FBI identified defendant as Abu al Abbas through multiple means, including searches around defendant's email account: jamesfoley870@gmail.com, a perverse reference to James Foley, the American journalist publicly beheaded by the Islamic State in 2014.

As shown at trial, defendant and Khattab played a critical role in promoting ISIS's terroristic goals. As the Court emphasized:

> ISIS viewed its media supporters as critical to its operations, and members of the unofficial foundations, including Khattab, understood their important role within ISIS's overall mission. Khattab members knew, and constantly discussed, how important ISIS viewed media in amplifying and disseminating their messages and described themselves as fighters in a "media war" in support of ISIS. And Khattab actively provided those critical media support services, generating media products that were violent, threatening, and prolific, as shown by the extensive evidence at trial.

*Id.* at 56-57. Defendant, through his work at Khattab, supported the Islamic State through three primary means: working on ISIS campaigns and making ISIS media, creating threatening propaganda that promoted violence and terrorism, and hacking Twitter accounts to spread ISIS media. PSR ¶ 18.

First, Khattab participated extensively in the Islamic State's media campaigns. *Id.* at 51-58. Such campaigns were "targeted media efforts to increase followers and listeners by focusing on a particular current event, such as an ISIS military operation." Findings of Fact at 6. Such events included the anniversary of 9-11, the 2018 World Cup, hosted in Russia, and the 2018 elections in Egypt.

Examples of Khattab's campaign work is below, marked with Khattab's logo.





*GX307; GX1100*                  *GX418*



*GX1100*

4

Second, Khattab and defendant designed infographics threatening and encouraging attacks in the West. Examples are below.



*GX418*

*Intentionally Left Blank*

5





*GX1103*

There was no doubt about defendant's intent in creating the Islamic State's propaganda and promoting its violent goals. As he told his fellow Khattab members: "We must spread fear among them, brothers," and "Participate in the war, spread terror, the State does not want you to watch it only, rather, it incites you, and if you are unable to, use it to incite others." GX211, GX284.

6



Abu Shanab                                                              7:15:38 PM
We must spread fear among them, brothers.
Access their media pages, Western #Al-Ramadi areas.                    7:16:39 PM

*GX211*



Ard Al-Iraq, Mahd Al-Khilafah 5/22/18

Work hard, brothers, edit the issue into short clips, take the pictures out of it and publish the efforts of your brothers in the pages of the apostates. Participate in the war, spread terror, the State does not want you to watch it only, rather, it incites you, and if you are unable to, use it to incite others. Know that rewards are multiplied in the seasons of goodness, and betrayal is a grave sin that cannot be forgiven even by fasting the whole month of Ramadan.

#Kirkuk Province
Video release: #Defeating_the enemy
http://bit.ly/2s96kcO

*GX284*

Third, defendant participated in so-called "Twitter raids" and repeatedly encouraged others to do the same. "Twitter raids" involved "taking over a Twitter account and the members simultaneously posting the Islamic State's content on that Twitter account until the account is deleted or suspended." *Id*. at 35; see also PSR ¶¶ 21-26. The evidence at trial established several such instances when defendant directly attacked Twitter accounts to post ISIS content, including in Counts Four through Eleven. The evidence also showed defendant's cajoling of fellow Khattab members to do the same.

*Intentionally left blank.*

7



*GX294*



*GX302*

Defendant's various media-support services to the Islamic State, through his work at Khattab, lasted a year, and he was devotedly unrepentant. He committed to taking the oath, or Bayat, to the Islamic State's caliph (GX402-12T), and as he explained to one fellow ISIS media member, "I dealt with it [Khattab] as if this was

8

my own foundation; as if I owned it personally, and I defended it as if this thing belonged to me. I mean as the Americans say, 'I was taking ownership'" (GX411T).

## II.    THE GUIDELINES RANGE

The government agrees with the Probation Office's calculation of the Guidelines range. PSR ¶¶ 36-61.

For the § 2339B Counts (One, Five, Seven, Nine, and Eleven), the base offense level is 26. U.S.S.G. § 2M5.3(a). Two levels are added because the offense involved the provision of material support or resources with the intent, knowledge, or reason to believe they are to be used to commit or assist in the commission of a violent act. See *United States v. Rahim*, 860 F. App'x 47, 57 (5th Cir. 2021) (applying § 2M5.3(b)(1)(e) where defendant "spread ISIS propaganda, engaged in recruiting followers, and incited others to commit attacks on behalf of ISIS."). Under § 3A1.4, the offense level is increased by 12 levels. Because defendant was a "manager" of the conspiracy—including by actual title, and in directing Khattab's writers group—three levels are added under § 3B1.1(b), for a total of 43 levels. See PSR ¶¶ 42-47.

For the true-threat conspiracy, § 875(c) Count (Two), the base offense level is 12. U.S.S.G. § 2A6.1(a)(1). Two levels are added because the offense involved more than one threat. U.S.S.G. § 2A6.1(a)(2)(A). Again, under § 3A1.4, the offense level is increased by 12 levels, for an offense level of 26. Because the resulting offense level is less than level 32, the offense level is 32. *Id*. This Count groups with the § 2339B Counts under § 3D1.2(b), because they involved the same victim (the general public) and the same common criminal objective (providing material support to ISIS by

9

promoting its violent propaganda). Therefore, the offense level for this group of counts is 43. U.S.S.G. § 3D1.3(a). See PSR ¶¶ 42-47.

For the § 1030 Counts (Three, Four, Six, Eight, and Ten), the base offense level is 7. U.S.S.G. § 2B1.1(a)(1). Two levels are added because the offense involved more than 10 victims. U.S.S.G. § 2B1.1(b)(2)(A)(i). Again, under § 3A1.4, the offense level is increased by 12 levels, for an offense level of 26. Because the resulting offense level is less than level 32, the offense level for this group of counts is 32. *Id*. These Counts group with one another, U.S.S.G. § 3D1.2(d), but not with the first group, because the § 1030 Counts involve different victims (specific Twitter users). Because this second group's offense level (32) is eight levels less serious than the first group's offense level (40), one level is added, for a total offense level of 41. U.S.S.G. § 3D1.4(a). See PSR ¶¶ 48-51.

As a result, the offense level is 43 and, under § 3A1.4, defendant's criminal-history category is VI. PSR ¶ 66. The range is therefore life imprisonment, plus any fine and supervised release the Court may impose. As the Probation Office notes because, technically, the combined statutory maximum—130 years—is less than "life," the range under § 5G1.2(b) is 130 years or 1,560 months. PSR ¶ 110.

## III.   THE SECTION 3553(a) FACTORS

After calculating the correct Guidelines range, the Court must analyze, weigh, and ultimate root its sentence in the factors set forth in 18 U.S.C. § 3553(a). As explained below, a sentence at the high-end of the Guidelines range, is sufficient but not greater than necessary to reflect the seriousness of the offense, promote respect for the law, provide just punishment, account for defendant's characteristics, and

10

afford adequate deterrence.

**A.    The Nature and Circumstances of the Offense, and the Need to Promote Respect for the Law and Provide Just Punishment, Merit a 40-Year Sentence.**

A 40-year prison sentence reflects the nature of defendant's offense and the need to provide punishment under § 3553(a). Defendant was functionally a contracted press person for the Islamic State—the most violent and prolific terrorist group of the second half of this century. He took the Islamic State's direction and regularly furthered its goals by creating and publishing propaganda and threats, both of which were designed to encourage others to join the Islamic State, commit attacks, and scare Westerners and apostates. And defendant did so, not for compensation, but because he, in fact, believed in the Islamic State's vision of terror. As he put it: "We must spread fear among them." GX211.

To be sure, defendant committed his crime behind a keyboard. But to think it was nonviolent would be error. Defendant encouraged lone-wolf attacks—at the World Cup, around elections, and in Western cities, only by way of example—and called for the spread of the caliphate. Indeed, defendant understood his crime as part and parcel of ISIS's terrorism. As he impelled his writers: "Work hard, brothers … and publish the efforts of your brothers in the pages of the apostates. *Participate in the war, spread terror*, the State does not want you to watch it only, rather, *it incites you*, and if you are unable to, *use it to incite others*." GX284 (emphasis added). And defendant's subjective understanding of his role in ISIS's operation was objectively correct. As the government's experts testified at trial, ISIS needed the services of outlets like Khattab to spread its message and engage in the "media war." See, *e.g.*,

11

Findings of Fact at 56-57. This was especially true in 2017 and 2018, when defendant helped manage Khattab, because the Islamic State was under significant pressure, both online, through Twitter bans, de-platforming, and other social-media restrictions that limited the reach of terrorist propaganda, and on the battlefield in the Middle East. *Id.* at 5, 16, 20-21. So it relied on groups, like the "prominent" Khattab, to maintain its "media war" (*id.* at 47), a role defendant eagerly filled.

Defendant made it his job to promote, encourage, and spread violence. He did so at the direction of the Islamic State to help them win both the "media war"—and the ultimate one. As such, a 40-year term of incarceration is appropriate.

**B.   Defendant's History and Characteristics, as Well as the Needs to Protect the Public and for Deterrence, Support a 40-Year Sentence.**

Defendant's history and characteristics, and the need for deterrence, also supports a 40-year prison term. Defendant was born in Iraq and, due to instability in the region, moved around throughout his childhood. PSR ¶¶ 71-82. Those experiences, including his firsthand experience with civil war, are mitigating to an extent.

But they do not justify much leniency here. Western countries accepted defendant and his family; first the United Kingdom during defendant's childhood and, later, the United States, when defendant was about age 24, which later gave defendant citizenship. And his family took advantage of the opportunities provided here. His father is a Chicago professor, his mother is a Dearborn educator (PSR ¶ 72), and defendant himself worked as a decently paid software developer in Chicago until the time of his arrest (PSR ¶ 102). Defendant, nevertheless, encouraged the spread

of violence in the West—despite experiencing instability himself as a child, and despite the opportunities it provided for him and his family.

Defendant is radicalized, and so the Court's sentence should account for his likelihood of recidivism and the need to protect the public and to deter future crimes. As explained, he committed to taking an oath to the Islamic State's caliph; he professionally engaged in the spreading of terror, in part through hacking of innocent people's social-media accounts; and he repeatedly expressed his desire for the Islamic State's terrorism to prevail. Defendant, in other words, philosophically and fervently opposes the United States's secular system of laws. There is, as a result, little reason to think that he will abide by them in the future, especially without a decades-long prison sentence and significant supervision. And the ease with which defendant committed his crime, from a computer with internet access, makes the likelihood of reoffending even higher. A 40-year sentence accounts for defendant's character, and it adequately incapacitates him to protect the public and, hopefully, prevents him from committing future crimes.

Defendant has also contended, before and during trial, that his offense amounted to First Amendment-protected conduct. That is false, for reasons the Court has explained. Findings of Fact at 58. Defendant, far from engaging in self-expression, took direction from the Islamic State in putting out its propaganda and threats. See *id.* What is more, at sentencing, "[t]he government may hold defendants to account for what they say if that speech and related conduct reveals a criminal element, a motive, or a factor that aggravates a sentence" under § 3553(a).

13

*United States v. Rayyan*, 885 F.3d 436, 441 (6th Cir. 2018) (citing *Wisconsin v. Mitchell*, 508 U.S. 476 (1993)); accord, *e.g.*, *United States v. Lickers*, 928 F.3d 609, 621 (7th Cir. 2019) (finding it aggravating that defendant expressed desire to harm others, there, children). Such is the case here. Defendant has repeatedly threatened those who the Islamic State deems disbelievers and apostates. The Court should account for that sincerely held, radical urge for bloodshed in issuing its sentence.

There is also a need for general deterrence. As explained at trial, and as found by the Court, terrorist organizations like the Islamic State rely on those away from the battlefield to spread their propaganda to gain more followers, foot soldiers, and lone wolves. See, *e.g.*, Findings of Fact at 56-57. The Court's sentence should send a message that aiding the spread of terrorism, even if, and maybe especially if, a hemisphere away from the battlefield, is a serious crime meriting a substantial prison term.

## IV. SUPERVISED-RELEASE CONDITIONS

The government recommends a lifetime of supervised release. See 18 U.S.C. § 3583(j) (authorizing lifetime terms for offenses listed in 18 U.S.C. § 2332b(g)(5)(B), which, in turn, includes § 2339B). Given defendant's radicalism and stated desire to harm others, it is important, in the government's view, that defendant and his Internet activity remain subject to scrutiny, in the interests of his rehabilitation and the public's safety.

A period of supervised release will provide the defendant with the supervision and assistance to help him become a law-abiding, productive member of society. The government further requests that the Court impose the conditions of supervised

14

release recommended in the PSR, which are appropriate in light of the defendant's criminal history, and are necessary to promote respect for the law, deter defendant from committing future crimes, protect the public from further crimes, and facilitate his supervision by the Probation Office.

Discretionary condition 23 and special condition 15 are of particular importance. PSR at 25, 27. Defendant, who has been fully radicalized, can commit the instant offense and others with little more than internet access. It is critical that the Probation Office be able to assure his compliance with his supervision and the law by monitoring his computer activity after his release.

## CONCLUSION

For these reasons, the government respectfully requests that the Court sentence defendant to a 40-year term of incarceration and a lifetime of supervised release.

Respectfully submitted,

ANDREW S. BOUTROS
United States Attorney

/s/ *Thomas P. Peabody*
THOMAS P. PEABODY
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60605
(312) 353-4307

Dated: February 23, 2026

15