UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**United States of America,**

    Plaintiff,

v.

    **No. 1:18-cr-696**

**Ashraf Al Safoo**,

    Judge John Robert Blakey

    Defendant.

## Defense Sentencing Memorandum

Defendant Ashraf Al Safoo, through undersigned counsel, respectfully submits this sentencing memorandum. The defense recommends that the Court impose a sentence of 88 months (7 years and 4 months), time considered served.[1]

---

[1] The defense calculates that Safoo will have been in custody for 88 months by the time he is sentenced on March 9, 2026. Defense counsel also calculates that, if Safoo's good time is factored in, the Court could theoretically sentence Safoo to as much as 100 months (8 years and 4 months) time considered served. The actual time served for a 100-month sentence is 7 years, 3 months, and 5 days, which Safoo will have surpassed by the sentencing hearing.

## Table of Contents

1.  Defense objections to the PSR ......................................................... 1

1.1.  USSG § 2M5.3(b)(1)(E) (+2)............................................................ 1

1.2.  USSG § 3A1.4(a) (+12) ...................................................................2

1.3.  USSG § 2B1.1(b)(2)(A)(i) ( +2) ........... **Error! Bookmark not defined.**

2.  Sentences of similarly situated defendants.....................................3

2.1.  Statistics kept by the U.S. Sentencing Commission represent similarly situated defendants.............................................................3

2.2.  U.S. Sentencing Commission statistics ..........................................6

2.3.  Specific cases ................................................................................7

2.3.1.  *United States v. Adel Daoud* ..........................................................8

2.3.2.  *United States v. Joseph Jones & Edward Schimenti* .........................9

2.3.3.  *United States v. Thomas Osadzinski* ............................................ 11

3.  Safoo's criminal history category bears no relation to reality ........ 13

4.  General deterrence does not require a lengthy sentence................. 15

5.  Safoo has little to no risk of recidivism ........................................ 17

6.  A fine is not appropriate.............................................................. 19

7.  Objections to discretionary conditions of supervised release......... 19

Appendix A — Tables and Charts

Appendix B — Guideline Application Frequencies FY2020 through FY2024

Appendix C — Letters of Support

Appendix D — Comprehensive Evaluation by Monica Connelly, LCSW (sealed)

1. **Defense objections to the PSR**

**1.1. USSG § 2M5.3(b)(1)(E) (+2)**

The PSR adds +2 offense levels under this guideline. *See* PSR, ¶ 43. To qualify for this enhancement, the Court must find that "the offense involved the provision of … (E) funds or other material support or resources with the intent, knowledge, or reason to believe they are to be used to commit or assist in the commission of a violent act". USSG § 2M5.3(b)(1)(E). This enhancement is applied in slightly over half of cases involving USSG § 2M5.3. Sentencing Commission statistics show that in the cases involving this guideline in the past five years, it was applied about 55% of the time. *See* APPENDIX A, TABLE 1; *see generally* APPENDIX B.

The PSR applies this enhancement based on the facts that:

- "The defendant designed infographics threatening and encouraging attacks in the West."
- "He created ISIS propaganda and promoted ISIS's violent goals to spread fear and terror."
- "The defendant also participated in "Twitter raids," which involved taking over a Twitter account and having members simultaneously post ISIS content on that Twitter account."

None of these facts satisfy the requirements for the enhancement. There is no evidence that any infographics constituted or "assisted in" any specific act of violence. While the propaganda was related to "spread[ing] fear and terror", those are not inherently equivalent to actual violence. Nor can any of the Twitter raids support the enhancement—those "raids" occurred entirely online and were by their very nature nonviolent.

1

### 1.2. USSG § 3A1.4(a) (+12)

The PSR recommends +12 offense levels for this enhancement, commonly called the Terrorism Enhancement. To apply, the offense of conviction must be "a felony that involved, or was intended to promote, a federal crime of terrorism," which is defined as an offense that "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct". USSG § 3A1.4(a) & n.1; 18 U.S.C. § 2332b.

The PSR does not identify the specific facts this enhancement is based on. That is a problem because the Terrorism Enhancement does *not* automatically apply to convictions under section 2339B. *See, e.g. United States v. Khweis*, 2023 U.S. App. LEXIS 20192, at *8-9 (4th Cir. Aug. 4, 2023) (collecting cases). The key question is whether the defendant had the specific intent to affect or retaliate against *government conduct. See, e.g., United States v. Ramirez*, 16 F.4th 844, 853 (11th Cir. 2021) (collecting cases in various circuits and discussing specific-intent requirement).

The evidence in this case that Safoo specifically intended to target a government's conduct is remarkably thin. Instead, Safoo's propaganda efforts were intended to reach individuals. For example, as the Court noted in its written ruling, "Defendant told the Khattab general members group, 'For the millionth time, we reiterate that there is no support on Telegram because it is a closed world exclusive for the supporters. The news did not *reach common Muslims*. He who thinks is a supporter and is fixated on Telegram only, let him think twice." [425], at 32 (emphasis added). As the quote makes clear, Safoo intended for Khattab's work to reach individual Muslims, not governments.

The burden is on the Government to "explain how specific facts indicate that [the defendant's] motive in providing material support was to influence or affect government conduct by intimidation or coercion, or to retaliate against government

2

conduct." *Khweis*, 2023 U.S. App. LEXIS 20192, at *8. "[M]ere knowledge of an organization's terrorist purpose doesn't automatically yield an inference of the specific intent required for the enhancement." *Id.*

Without such factual findings, the Terrorism Enhancement cannot be applied in this case.

## 2. Sentences of similarly situated defendants

### 2.1. Statistics kept by the U.S. Sentencing Commission represent similarly situated defendants

The Government has occasionally taken issue with the defense's use of U.S. Sentencing Commission statistics to identify sentences imposed on similarly situated defendants in prior cases, calling them so broad, and general, as to be practically useless for purposes of comparison.

The U.S. Sentencing Commission disagrees. In its Introduction to the 2024 *Sourcebook of Federal Sentencing Statistics*, the Commission explains:

> The Commission collects and analyzes data on federal sentences to support its various activities. As authorized by Congress, the Commission's numerous research responsibilities include: (1) the establishment of a research and development program to serve as a clearinghouse and information center for the collection, preparation, and dissemination of information on federal sentencing practices; (2) the publication of data concerning the sentencing process; (3) t*he systematic collection and dissemination of information concerning sentences actually imposed and the relationship of such sentences to the factors set forth in section 3553(a)* of title 18, United States Code; and (4) the systematic collection and dissemination of information regarding the effectiveness of sentences imposed.

(Emphasis added.) The Commission makes this data publicly available through its Interactive Data Analyzer, and it also issues a variety of research reports assessing sentencing data.

3

The annual sourcebook contains a wealth of sentencing information, but for present purposes the key report is *Inter-District Differences in Federal Sentencing Practices* (Jan. 2020). The introduction explains:

> This report, the third in the series, builds directly upon the Commission's Intra-City Report. As noted in that publication, *the Commission's ongoing analysis in this area directly relates to a key goal of the Sentencing Reform Act of 1984: reducing unwarranted sentencing disparities* that existed in the federal judicial system. In particular, the Act was the result of a widespread bipartisan concern that such disparities existed both regionally (e.g., differences among the districts) and within the same courthouse.

*Id.*, at 6. In the methodology section, the Commission notes that it uses the guideline minimum as the benchmark for its comparative analysis:

> For each case, the guideline minimum and the actual sentence imposed were determined, and a percent difference between the two was calculated....
>
> The guideline minimum was chosen as the baseline for analysis because of the gravitational pull it tends to have on sentences. The Supreme Court has directed "benchmark" and "starting point" in the post-Booker federal sentencing process and to "remain cognizant" of it during all three steps of the "Booker three-step process" used at federal sentencing.

*Id.*, at 18. To state the obvious, the guideline minimum is necessarily determined by a defendant's Final Offense Level and Criminal History Category. The Commission used this benchmark to compare sentencing outcomes by primary guideline. *See id.*, at 16 (Analysis By Primary Guideline):

> In creating the datasets, the Commission identified 972,783 cases across the nation during fiscal years 2005 to 2017. The Commission then isolated the relevant cases for each guideline-specific analysis by limiting cases based on their primary guideline—that is, the guideline with the highest adjusted offense level, which therefore controlled the guideline calculation. *For example, the §2B1.1 analysis includes only those cases in which §2B1.1 was the primary guideline.*

*Id.*, at 16–17 (emphasis added).

In short, the Commission examines sentencing disparities by comparing sentencing outcomes based on (1) the primary guideline, (2) the final offense level,

4

(3) the criminal history category, and (4) the sentence imposed. That is precisely the data the defense presents below.

To be fair, it can be useful and interesting to delve further into case statistics to compare them in greater detail. The Commission's dataset includes a daunting array of variables that can be examined, including Specific Offense Characteristics, Base Offense Levels, and so on. *See* Variable Codebook for Individual Datafile, FY 1999–2023. But two practical barriers counsel against using more granular statistics at an individual sentencing hearing. First, the datafiles are formatted for SAS and SPSS, which to even open require advanced data analysis software that is expensive and difficult for non-specialists to learn and use effectively. The Interactive Data Analyzer was created specifically to address that problem. Second, the Commission cautions against using too many variable filters:

> Using several filters at one time can result in a small number of cases in any particular table or figure. For example, when using numerous filters, it may be possible that some figures will display percentages or averages of a very small number of cases. The Commission cautions that analyses based on small populations may have limited informational value in discerning trends, generalizing to larger populations, or making other statistical observations.

Interactive Data Analyzer, Ask IDA (click question mark for pop up). For the purpose of comparing the sentences of similarly situated defendants at an individual sentencing hearing, the broader dataset sorted by primary guideline and criminal history category is the most appropriate and is used by the Commission itself.[2]

As a final point, it is worth asking: if this methodology is not appropriate for comparing similarly situated codefendants, as section 3553(a) requires, then what methodology is? The government has not provided an answer in any case where

---

[2] It would be more helpful if the IDA also allowed filtration by final offense level, but that is not yet available. The Sentencing Resource Counsel's Sentencing Resource Data Analyzer, however, does permit filtration by final offense level.

they have previously raised this objection, nor has it presented any affirmative argument whatsoever regarding similarly situated co-defendants.

### 2.2. U.S. Sentencing Commission statistics[3]

The primary guideline is USSG § 2M5.3.[4] The PSR calculates Safoo's guidelines as Final Offense Level 43 with a Criminal History Category (CHC) VI, resulting in a recommended range of life. *See* PSR, ¶¶ 61, 66.

Because this is a terrorism case, USSG § 3A1.4(b) mandates a CHC VI as a matter of law, notwithstanding that Safoo has no actual criminal history and is a zero-point offender. *See* PSR, ¶ 66. Consequently, this discussion is confined to comparator sentences imposed between FY2020 and FY2024 that had primary guideline USSG § 2M5.3, and CHC VI.

Nationally, there were only 67 cases with this primary guideline during the reporting period. *See* APPENDIX A, Fig. 1, at A-2. Of those cases, 11 (16.4%) went to trial. *See* APPENDIX A, Fig. 2, at A-3.

Of note is the distribution of the length of sentences imposed. *See* APPENDIX A, Fig. 3, at A-4. Even though the guidelines call for a sentence of life in prison, the vast majority of defendants were sentenced to less than 20 years, with more than 25% receiving sentences of less than 10 years:

| | |
|---|---|
| Less than two years | 9.0% |
| 2 to less than 5 | 9.0% |

---

[3] Unless otherwise noted, all data discussed in this section is drawn from Sentencing Resource Counsel, Sentencing Resource Data Analyzer and the Sentencing Commission's Interactive Data Analyzer. The data used for this interactive dashboard and these analyses were extracted from the U.S. Sentencing Commission's "Individual Datafiles" from fiscal year 2020–2024. This dataset is publicly available for download on the Commission's website. U.S. Sent'g Comm'n, Commission Datafiles, https://www.ussc.gov/research/datafiles/commission-datafiles.

[4] In a case like this with more than one guideline calculation, resulting from multiple counts of conviction, the primary guideline is the guideline that resulted in the final offense level that the court applied when determining the sentence.

| | |
|---|---|
| 5 to less than 10 years | 14.9% |
| 10 to less than 15 years | 26.9% |
| 15 to less than 20 years | 16.4% |
| 20 to less than 25 years | 16.4% |
| 25 to less than 30 years | 3.0% |
| 30 to less than life | 9.0% |

Also of note are the average and median sentence lengths, which are 156 months and 150 months, respectively. *See* APPENDIX A, Fig. 5, at A-6.

Regarding Chapter 2 and Chapter 3 adjustments that may apply in this case, the Terrorism Adjustment under USSG § 3A1.4 (+12) was applied in all but one case, rendering that factor of little use in distinguishing between sentences. *See* APPENDIX A, Table 1, at A-1. In contrast, the Aggravating Role Adjustment under USSG § 3B1.1 (+3) is applied relatively rarely, making this factor more useful for fine-grained comparisons of similarly situated defendants.

Turning to the Northern District of Illinois, there were only 4 comparable cases during the reporting period. *See* APPENDIX A, Fig. 6, at A-7. Importantly here, *none* of the four defendants were sentenced to more than 15 years, and two of them received sentences of 5 to 10 years. *See* APPENDIX A, Fig. 7, at A-8. All four sentences were well below guidelines, with a median sentence of 117 months and average of 114 months. *See* APPENDIX A, Fig. 6, at A-7.

### 2.3. Specific cases

Aside from statistical comparisons, examining the sentences imposed in other material support for terrorism cases in this district demonstrates that a sentence of 88 months for Safoo is well within reason.

7

### 2.3.1. United States v. Adel Daoud[5]

This case represents the upper limit of sentences imposed in terrorism-related cases in this district. The Seventh Circuit's opinion on appeal succinctly explains the essential facts:

> Adel Daoud pressed the button to detonate a bomb that would have killed hundreds of innocent people in the name of Islam. Fortunately, the bomb was fake, and the FBI arrested him on the spot. Two months later, while in pretrial custody, Daoud solicited the murder of the FBI agent who supplied the fake bomb. Two and a half years later, while awaiting trial on the first two charges, Daoud tried to stab another inmate to death using makeshift weapons after the inmate drew a picture of the Prophet Muhammad. Daoud eventually entered an *Alford* plea, and the cases were consolidated for sentencing.

*United States v. Daoud*, 980 F.3d 581, 584 (7th Cir. 2020). District Judge Sharon Johnson Coleman district court originally sentenced Daoud to 16 years in prison, but following a successful government appeal the case was reassigned to District Judge Matthew Kennelly, who resentenced him to 27 years in prison. *See United States v. Daoud*, No. 1:12-cr-723, [573] (Judgement Order) (July 30, 2024).

For comparison, the relevant sentence is the 324-month sentence on Count 1, Attempted Use of a Weapon of Mass Destruction in violation of 18 U.S.C. § 2332a(a)(2)(D). The most obvious and important difference between *Daoud* and Safoo is that *Daoud* was charged under 18 U.S.C. § 2332a (Use of weapons of mass destruction), whereas Safoo was charged under 18 U.S.C. § 2339B (Providing material support or resources to designated foreign terrorist organizations). The two statutes fall under different sentencing guidelines: USSG §§ 2A1.1 (, 2A1.2, 2A1.3, or 2A1.4 for section 2332a; compared to USSG § 2M5.3 for section 2339B. *See* U.S. Sentencing Guidelines, APPENDIX A.

Consequently, although both cases ostensibly involve terrorism, *Daoud*'s 27-year sentence was based on a completely different section of the guidelines than

---

[5] Nos. 1:12-cr-723, 1:13-cr-703 & 1:15-cr-487 (N.D. Ill.) (Coleman, J; Kennelly, J.).

Safoo's will be. As noted above in section 2.2, the Sentencing Commission considers defendants similarly situated when they share, among other things, the same primary guideline. Thus, as a matter of law, *Daoud* and Safoo are not comparable.

Nor are the cases comparable on the facts. *Daoud* involved a plot to commit a horrific act of mass murder, and the defendant went so far as to press the button that he believed would trigger bomb. In contrast, Safoo wrote articles on the Internet in favor of the Islamic State. That was the extent of his "material support for terrorism." The actions and intentions of the two defendants were not remotely the same, rendering *Daoud* of little to no relevance as a comparator.

### 2.3.2.   United States v. Joseph Jones & Edward Schimenti[6]

In this case, the defendants were approached by and developed relationships with multiple undercover government agents posing as supporters of the Islamic State. *See generally United States v. Jones*, 79 F.4th 844 (7th Cir. 2023). Over about two-and-a-half years, Jones and Schimenti resisted multiple attempts by the undercover agents to encourage them to emigrate from the United States to Syria to fight with or otherwise support the Islamic State. It was not until the Government inserted a confidential informant into the mix that Jones and Schimenti took the actions for which they were ultimately convicted: driving the confidential informant to the airport, "where they believed he would be traveling to Syria with the nine cell phones they had given him to use as makeshift bombs in his role as an ISIS fighter." *Id.* at 850.

Jones was sentenced to 144 months (12 years) in prison for material support for a DTO under section 2339B, while Schimenti received 162 months (13.5 years).

---

[6] No. 1:17-cr-236 (N.D. Ill.) (Wood, J.). Undersigned defense counsel was trial and appellate counsel in this case for defendant Joseph Jones.

9

Schimenti received a higher sentence because he was also convicted of making a materially false statement to the FBI during his post-arrest interview in violation of 18 U.S.C. § 1001(a)(2).

*Jones* is a better comparator than *Daoud* because *Jones*, like this case, involved section 2339B violations and USSG § 2M5.3. They are therefore legally quite similar. The difference between *Jones* and Safoo lies in the specific actions taken by each defendant. Unlike Safoo, Jones and Schimenti collected cell phones and gave them to the confidential informant while knowing that he intended to use them to commit violence in service of the Islamic State in Syria.

There is no comparable act by Safoo that is directly linked to any actual violence. That is, Jones and Schimenti provided material support to the Islamic State in the form of physical materials that they knew would be used to make bombs. In contrast, Safoo's "material support" for the Islamic State was at best limited to morale: writing online articles, creating infographics, disseminating memes, and generally posting on social media platforms. Further, Jones and Schimenti personally assisted and gave materiel to someone whom they believed was leaving to join the Islamic State in Syria. In contrast, the evidence at trial showed that neither Safoo personally, nor the organization he was affiliated with, had direct links to the Islamic State or took direction from known Islamic State members.[7]

There is consequently a material difference between the kind of support that Jones and Schimenti supplied to the Islamic State and the kind that Safoo provided. The former was directly related to providing the Islamic State with personnel and materiel for planning attacks and violence, whereas the latter was

---

[7] Note that there was evidence that Khattab took programming direction from the Islamic State, but only *after* Safoo resigned from the organization and was arrested.

limited to independently creating and spreading propaganda that only indirectly benefitted the Islamic State.

In short, the defendants' actions in *Jones* were significantly more dangerous, and thus more serious, than Safoo's actions in this case. The sentences imposed in *Jones* demonstrates that at best, any reasonable sentence in this case must be below the 12 years that Jones received.[8] That is well below the 216 months (18 years) that the U.S. Probation Office recommends to the Court.

### 2.3.3. United States v. Thomas Osadzinski[9]

This case is the most comparable to Safoo's case. The Seventh Circuit summarized the facts as follows:

> In 2019 [Osadzinski] created a computer program that allowed ISIS (the Islamic State in Iraq and Syria) and its followers to rapidly duplicate terrorist propaganda videos online and thereby to stay a step ahead of efforts by the United States and other western governments to thwart the organization's media campaign. Osadzinski shared his computer program with people he believed were ISIS supporters, taught them how to use it, and deployed it to compile and disseminate a large trove of ISIS media.

*United States v. Osadzinski*, No. 97 F.4th 484, 486–87 (7th Cir. 2024). For these actions, Osadzinski was convicted of violating section 2339B and sentenced to 90 months (7.5 years) in prison.

Like *Jones*, *Osadzinski* was convicted under the same statute as Safoo, and his sentence was based on the same primary guideline. But unlike *Jones*, the relevant conduct in both *Osadzinski* and Safoo involved expressive activity—creating, executing, and distributing source code in the former,[10] and writing articles and

---

[8] The Probation Office recommends the Court sentence Safoo to 216 months (18 years). The Government is asking for 40 years.

[9] No. 1:19-cr-86 (N.D. Ill.) (Gettleman, J.).

[10] See *Osadzinski*, 97 F.4th at 491: "The government appears to concede that all of Osadzinski's relevant conduct constitutes speech. We are comfortable, therefore, assuming without definitively deciding that Osadzinski's offense conduct consisted entirely of expressive activity within the meaning of the First Amendment."

11

posting or commenting on social media for the latter.[11] The Seventh Circuit was careful to note that this kind of expressive activity is protected by the First Amendment, but also that *Osadzinski*'s conviction rested on more than simple expression:

> Osadzinski is right on a broad level. Any holding that would eliminate—explicitly or otherwise—a person's right to engage in independent advocacy for a terrorist organization would conflict with long-recognized constitutional principles. We have observed that section 2339B does not prohibit persons from expressing sympathy for the views of a foreign terrorist organization. We reject any interpretation of "coordination" or "direction" that would prohibit expressive activity aligned with that view.
>
> But Osadzinski's baseline assumption is mistaken. He was not convicted simply for watching Inside 8 and subsequently engaging in what would otherwise constitute independent advocacy. Far from it. *At every step, Osadzinski closely coordinated his activity with ISIS and its media office* by contributing to official videos and providing them with a software tool to organize, duplicate, and disseminate media to a wider audience while circumventing censors. Our affirming his conviction respects these legal lines.

*Osadzinski*, 97 F.4th at 493 (cleaned up) (emphasis added).

The defense recognizes that the Court rejected Safoo's First Amendment defense at trial. That finding makes this case nearly identical to *Osadzinski* for sentencing purposes. Yet there is still a fine but crucial difference between the two cases. As the Seventh Circuit observed, *Osadzinski* "closely coordinated" with ISIS at every step. Safoo did not. The evidence at trial showed that *at best* the leader(s) of Safoo's organization coordinated with the Islamic State without Safoo's knowledge or personal involvement. There is thus a material difference in culpability between the two defendants. Both supported the Islamic State, but only *Osadzinski* deliberately coordinated with it directly. Safoo did not.

---

[11] See *Osadzinski*, 97 F.4th at 491 (Noting "several activities that have been recognized as expression, such as *writing an article* and instruction manual, *forwarding multimedia links*, and sending pro-ISIS messages over *social media*." (Emphasis added)).

### 3. Safoo's criminal history category bears no relation to reality

Safoo's history and characteristics are discussed extensively in the PSR and in LSCW Monica Connelly's evaluation report. *See* APPENDIX D (under seal). For brevity, this section discusses only his criminal history, or lack thereof.

As noted, Safoo has zero criminal history points. He is only considered a CHC VI offender because of the Terrorism Enhancement. This completely distorts Safoo's actual history. That arbitrary increase in criminal history (and offense level, for that matter) "'takes a wrecking ball' to the initial Guidelines range." *United States v. Jumaev*, 2018 U.S. Dist. LEXIS 119916, at *12 (D. Colo. July 18, 2018) (quoting George D. Brown, *Punishing Terrorists: Congress, the Sentencing Commission, the Guidelines, and the Courts*, 23 Cornell J.L. & Pub. Pol'y 517, 520 (2014)).

The arbitrary nature of the Terrorism Enhancement has led many courts to discount the effect of the enhancement under section 3553(a). For example, in *United States v. Dais*, 482 F. Supp. 3d 800 (E.D. Wis. Aug. 27, 2020), the district court summarized the well-known problems with the enhancement. The discussion is worth quoting in full:

> The base offense level for a violation of 18 U.S.C. § 2339B is 26. U.S.S.G. § 2M5.3(a). The guideline further provides for a 2-level enhancement if the offense involved the provision of dangerous weapons or funds used to purchase such weapons. U.S.S.G. § 2M5.3(b). Finally, the guideline provides cross references to the murder guidelines if the offense resulted in death, § 2M5.3(c)(1), the attempted murder guideline if the offense was tantamount to that offense, § 2M5.3(c)(2), and the weapons of mass destruction guideline if the offense involved the provision of such materials, § 2M5.3(c)(3). The guideline thus links the offense level to the nature of the assistance provided and the extent of any harm caused by the offense.
>
> However, U.S.S.G. § 3A1.4, the "terrorism" guideline, trumps this carefully calibrated approach…. This means that a defendant in a § 2339B case will usually face a range well in excess of the statutory maximum of 20 years, regardless of what he specifically did and regardless of whether he has no prior record or a terrible one. This case was an example: although defendant's offense involved none of the aggravating circumstances set forth in U.S.S.G. § 2M5.3, and despite the fact that she had no prior criminal

13

history, she ended up with an advisory guideline range of 292-365 months, which defaulted to 240 months under U.S.S.G. § 5G1.1(a).

In this sense, U.S.S.G. § 3A1.4 resembles the child pornography guideline, U.S.S.G. § 2G2.2, which has been roundly criticized by the courts, in that it recommends sentences near or above the statutory maximum even in mine run cases. This is contrary to the purposes of sentencing in 18 U.S.C. § 3553(a), including the notion that sentences should be individualized and proportionate, and that we should distinguish between the worst offenders and those who are less dangerous.

It is also contrary to the theory behind the guidelines: that the offense level will reflect the seriousness of the offense, increasing incrementally based on specific aggravating facts, and the criminal history category will reflect the risk to the public, based on the defendant's prior record. As Judge Breyer has noted, the terrorism enhancement "takes a wrecking ball" to this construct. Terrorism cases are undoubtedly serious, but automatically increasing a defendant's criminal history to reflect the seriousness of the charged offense seems misguided. Id. at 1014. Further, as Judge Kane has noted, material support cases can involve a wide range of conduct, yet § 3A1.4 frequently results in guideline ranges that equal or exceed the maximum statutory sentence, without differentiating between various levels of conduct. Finally, as both Judges have noted, this guideline was enacted pursuant to a congressional directive and absent empirical evidence. Such guidelines do not exemplify the Sentencing Commission's exercise of its characteristic institutional role.

Accordingly, the guidelines provided limited guidance in this case.

*Dais*, 482 F. Supp. 3d at 802-03 (cleaned up).

Contrary to the distorted picture of him that his Criminal History Category VI paints, Safoo has lived the law-abiding life of a normal citizen, unlike many of the defendants this court sees and some members of Safoo's own family. The only time he has ever spent in prison is the nearly seven and a half years he has spent at MCC-Chicago awaiting trial. Safoo has received no disciplinary tickets while incarcerated that the defense is aware of. He has never even physically harmed another person. Even the conduct in this case was confined to words on the internet. Safoo did not seek to travel to Syria to join the Islamic State on the battlefield. He did not seek opportunities to injure or kill people here in Chicago or elsewhere in the United States. But for the fact that the Islamic State is a

14

designated foreign terrorist organization, his actions would fall comfortably within the protection of the First Amendment.

### 4. General deterrence does not require a lengthy sentence

Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing,* 34 Crime & Just. 1, 28 (2006).

In a 2013 essay, *Deterrence in the Twenty-First Century*, Daniel S. Nagin explored the current state of theory and empirical knowledge about deterrence. The National Institute of Justice, which "is the research, evaluation, and technology agency of the U.S. Department of Justice and is dedicated to improving knowledge and understanding of crime and justice issues through science", examined Nagin's article and summarized "a large body of research related to deterrence of crime" into five points:

1. The *certainty* of being caught is a vastly more powerful deterrent than the punishment;
2. Sending an individual convicted of a crime to prison isn't a very effective way to deter crime;
3. Police deter crime by increasing the perception that criminals will be caught and punished;
4. Increasing the severity of punishment does little to deter crime;
5. There is no proof that the death penalty deters criminals.

The first and fourth points are especially relevant here. The greatest general deterrent effect is generated by *arrest*, not conviction or length of punishment:

> *Certainty* refers to the likelihood of being caught and punished for the commission of a crime. Research underscores the more significant role that certainty plays in deterrence than severity — it is the certainty of being

> caught that deters a person from committing crime, not the fear of being punished or the severity of the punishment. Effective policing that leads to swift and certain (but not necessarily severe) sanctions is a better deterrent than the threat of incarceration. In addition, there is no evidence that the deterrent effect increases when the likelihood of conviction increases. Nor is there any evidence that the deterrent effect increases when the likelihood of imprisonment increases.

*Id.*

This conclusion is borne out in the U.S. Sentencing Commission's March 2016 report, *Recidivism Among Federal Offenders: A Comprehensive Overview*. Among the report's key findings is that "with the exception of very short sentences (less than 6 months), the rate of recidivism varies very little by length of prison sentence imposed (fluctuating between 50.8% for sentences between 6 months to 2 years, to a high of 55.5% for sentences between 5 to 9 years)."

More recently, the University of Chicago published a meta-analysis of the deterrent effect of custodial sentences. *See* Petrich, et al., *Custodial Sanctions and Reoffending: A Meta-Analytic Review* (Sep. 22, 2021). In their abstract, the study's authors summarized their findings:

> Previous narrative reviews and meta-analyses concluded that the overall effect of imprisonment is null. Based on a much larger meta-analysis of 116 studies, the current analysis shows that custodial sanctions have no effect on reoffending or slightly increase it when compared with the effects of noncustodial sanctions such as probation. This finding is robust regardless of variations in methodological rigor, types of sanctions examined, and sociodemographic characteristics of samples. All sophisticated assessments of the research have independently reached the same conclusion. The null effect of custodial compared with noncustodial sanctions is considered a "criminological fact." **Incarceration cannot be justified on the grounds it affords public safety by decreasing recidivism**.

Given the empirical evidence regarding the limited deterrent effect of custodial sentences, a sentence of 88 months is adequate but not greater than necessary to satisfy the sentencing factor of general deterrence. A longer sentence will do little to nothing increase the general deterrent effect.

16

5.  **Safoo has little to no risk of recidivism**[12]

Though Safoo's criminal history category was adjusted to category VI by operation of the terrorism enhancement, he is in fact a zero-point offender in CHC I. This section examines recidivism rates of CHC I defendants because that reflects Safoo's actual past conduct and future risk.

As a general matter, the well-known Terrorism Recidivism Study concluded that "[o]nly **1.6%** of terrorist offenders released between 2001 and 2018 recidivated, and none of the crimes which they committed post-release were clearly politically motivated." Hodwitz & Omi, *The Terrorism Recidivism Study (TRS): Examining Recidivism Rates for Post-9/11 Offenders*, PERSPECTIVES ON TERRORISM 13 (April): 54-64. Courts have also questioned baseline assumptions about recidivism in terrorism cases. *See*, *e.g.*, *United States v. Doe*, 323 F. Supp. 3d 368, 390–91 (E.D.N.Y. 2018) (Weinstein, J.) (noting lack of data on terrorist recidivism rates and that the "likelihood for recidivism is highly individualized and should be assessed on a case-by-case basis"); *United States v. Alhaggagi*, 372 F. Supp. 3d 1005, 1014–15 (N.D. Cal. 2019) (rejecting the terrorism enhancement for several reasons, including that it was inappropriate based on a generalized risk of recidivism for terrorism offenses).

The two strongest predictors of recidivism are criminal history and age. *See Recidivism of Federal Offenders Released in 2010*, U.S. Sentencing Comm'n, at 24 (Sep. 30, 2021). In general, the Sentencing Commission finds "notably lower arrest rates among offenders in CHC 1 compared to offenders in higher CHCs." *Id.* at 27. For zero-point offenders like Safoo who have had no prior contact with the criminal justice system, the recidivism rate is even lower: only 20.3% are rearrested. This rate is far lower than even one-point offenders or zero-point

---

[12] All statistics in this section are taken from *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* (2004), available at USSC Publications

offenders with prior contact. *Id.* at 28 & fig. 15 (reproduced below). *See also Criminal History and Recidivism of Federal Offenders*, U.S. Sentencing Comm'n, at 7 & fig. 1 (reproduced below).



Figure 15.  Rearrest Rates for Offenders with Limited Criminal History
*Federal Offenders Released in 2010*



Figure 1.
Rearrest Rates for Recidivism Study Offenders by Criminal History Points

Safoo is well placed to succeed after his release and is unlikely to recidivate. He has a master's degree in computer science. He was steadily employed prior to his arrest. He is married with children. He does not use alcohol or illicit drugs. He has

18

extensive family support. In short, Safoo is not likely to recidivate. There is no evidence to suggest that Safoo will be anything less than a law-abiding citizen once he is released.

### 6. A fine is not appropriate

The guidelines note that the Court "shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." USSG § 5E1.2(a).

Safoo has no present income and thus has no ability to pay a fine. The Court appointed counsel to represent Safoo under the CJA due to his lack of financial resources. Moreover, Safoo's income once released is uncertain, and it is unlikely that he will be able to pay a fine in the future. Consequently, the defense requests that the Court decline to impose a fine.

### 7. Objections to discretionary conditions of supervised release

Mandatory Condition 6: This condition is unnecessary. Safoo does not drink alcohol or use any illegal substances. He is a devout Muslim, and doing so would violate his faith.

Discretionary Condition 7: This condition is unnecessary. Safoo does not drink alcohol or use any illegal substances. He is a devout Muslim, and doing so would violate his faith.

Partial objection to Discretionary Condition 16: Safoo objects to the requirement that Probation be allowed to visit him at work. Employers often view workplace visits as intrusive or disruptive to the workplace, even when they are aware that employees are under supervision, and often terminate employment after such a visit. This creates tension with the goals of rehabilitation and Discretionary Condition 4, that Safoo seek or maintain employment. Probation can adequately

19

supervise Safoo with home visits, visits to community service locations, or visits at other reasonable locations specified by the supervising officer, including meeting with Safoo near his workplace during his breaks, such as a nearby coffee shop or restaurant, or in the parking lot of his workplace.

Should the court decide to impose this condition over the objection, counsel proposes modifying the language of the condition as follows "probation may visit Safoo at work, if the visit is pre-arranged with Safoo." This modification gives probation the flexibility to meet with Safoo at work, while protecting Safoo's employment by ensuring that probation's visits are not disruptive. Judge Rowland proposed and gave this language in two relatively recent cases, *United States v. Lee*, No. 1:22-cr-535, and *United States v. Whitehead*, No. 1:22-cr-393-2.

Special Condition 6: If the court declines to fine Safoo, this condition is not necessary.

Special Condition 15: Safoo presents an unusual situation, as he has a master's degree in computer science, and has primarily worked as a software developer or engineer. Restrictions on Safoo's computer use will need to be tailored to allow him to work. There is no evidence that Safoo used any specialized computer software or knowledge during the offense.

The probation officer's speculation that Safoo's computer knowledge "may have aided in his commission of the instant offense" is not supported by the evidence. Safoo used public websites, available to anyone and everyone, including Telegram and Twitter. He employed no specialized computer skills or knowledge. Even taking the Government's evidence at face value for the sake of argument, if Safoo himself accessed dormant Twitter accounts using dormant Hotmail accounts, the government's evidence at trial showed that various groups passed around videos demonstrating the password reset work-around employed to gain

20

control of Twitter accounts. There is no evidence that Safoo personally made these videos.

Respectfully Submitted,

/s/ James G. Vanzant
Attorney for Defendant

James G. Vanzant
Holly N. Blaine
Erin L. Sostock
BLAINE & VANZANT, LLP
922 Davis Street
Evanston, Illinois 60201
Tel.: (312) 788-7584
Email: jgv@blainevanzant.com
Email: hnb@blainevanzant.com
Email: els@blainevanzant.com

21